## Schoffstall v. Nationwide Insurance Company

16

C.P. of York County, no. 1994-SU-04190-01.

*James D. Greenberg,* for plaintiff.
*Lee E. Ullman* and *Michael A. Bloom,* for defendant.

THOMPSON JR., *J.,* June 28, 2002—Before the court is plaintiff Tony Schoffstall's motion for partial summary judgment and defendant Nationwide Mutual Insurance Company's cross-motion for summary judgment. Mr. Schoffstall claims that Nationwide engaged in the unauthorized practice of law by using a staff trial attorney to defend him. Mr. Schoffstall argues that this conduct constitutes bad faith as a matter of law. Nationwide counters that it did not engage in the unauthorized practice of law. Furthermore, it claims Mr. Schoffstall has not produced sufficient evidence to warrant a finding of bad faith. For

the reasons explained below, plaintiff's motion for partial summary judgment will be denied and defendant's cross-motion for summary judgment will be granted.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Tony Schoffstall brought this action against his automobile insurer, Nationwide Mutual Insurance Company, for alleged bad faith in handling an accident claim against him. The claim arose out of an August 2, 1991 car accident where a car driven by Tony Schoffstall crossed the center line on Route 94 in Adams County and struck head-on a car occupied by Thomas Hannigan, his wife Barbara Ann Hannigan, his sister Mary Alice Hannigan, and his mother Mary D. Valdes. The Hannigans sued Mr. Schoffstall whose insurance policy carried a $100,000 limit per claim and $300,000 limit per occurrence.

Nationwide assigned the case to its staff trial attorney, Donald R. Dorer. Attorney Dorer was a full-time salaried employee of Nationwide. In the underlying case, only damages were in dispute as there was no dispute Mr. Schoffstall's negligence caused the car accident. At all times Attorney Dorer maintained a separate law office, apart from Nationwide's offices, with a sign and letterhead entitled "Law Offices of Donald R. Dorer."

Before suing Mr. Schoffstall, counsel for Ms. Hannigan, Gary E. Hartman, Esquire, made a demand of $325,000 to settle Ms. Hannigan's claim. Attorney Dorer countered with an offer of $20,000 to settle the claim. In a letter dated August 15, 1994, Ms. Hannigan offered to settle her case for Mr. Schoffstall's policy limit of

$100,000. At the direction of Nationwide, Attorney Dorer rejected Ms. Hannigan's settlement offer. Before trial, Attorney Dorer made offers of $30,000 and $45,000 to settle the case. The trial itself resulted in a verdict for Ms. Hannigan for $119,522.79, exceeding Mr. Schoffstall's coverage by $19,522.79.

Immediately following the verdict, Attorney Dorer obtained an agreement from the Hannigans' attorney that they would not execute on any of Mr. Schoffstall's personal property in order to collect on the judgment against him. However, Mr. Schoffstall refused to execute an assignment and release that would have assigned all his rights and claims to Ms. Hannigan against Nationwide for breach of contract or fiduciary duty for failing to settle the claims within Mr. Schoffstall's policy limits in exchange for her promise not to execute the judgment against Mr. Schoffstall's personal property.

Thereafter, Mr. Schoffstall initiated this suit by filing a writ of summons against Nationwide on October 11, 1994. Following the filing of a praecipe for a rule to file complaint, Mr. Schoffstall filed a complaint on February 24, 1995. The complaint alleges that Nationwide acted in bad faith under 42 Pa.C.S. §8371 for failing to settle the underlying action. By letter of April 19, 1995, counsel for Nationwide informed Attorney Hartman that Nationwide would pay the excess verdict. After communication back and forth regarding the amount of interest and delay damages, the judgment was satisfied in July 1995, approximately five months after Mr. Schoffstall had filed his complaint. Mr. Schoffstall later admitted that no attempt was ever made by Ms. Hannigan or anyone else to execute on Mr. Schoffstall's property nor was

he ever asked, orally or in writing, to pay the amount of the excess verdict.

Following a pretrial conference before the Honorable Judge Horn on May 30, 1996, a pretrial order was issued on June 18, 1996 which did not certify the case for trial because discovery was not complete. This order also required that any dispositive motions should be processed through the procedure established by Local Rule 6030.

Discovery proceeded, though hindered by much procedural wrangling. Discovery is now complete in this matter. Mr. Schoffstall filed a motion for partial summary judgment on May 9, 2000. Nationwide then filed a cross-motion for summary judgment on June 22, 2000. For reasons that are unknown, the motions were presented to the undersigned judge and not listed for one-judge disposition as provided by Local Rule 6030. Nevertheless, in the interest of judicial economy, the undersigned judge decided to dispose of the motions.[1]

The court delayed decision on both of these motions because the Supreme Court had granted allocatur on a possible controlling issue of law in another case. That case, *The Birth Center v. The St. Paul Companies Inc.*, 567 Pa. 386, 787 A.2d 376 (2001), was decided by the Supreme Court on December 31, 2001. In light of the Supreme Court's decision, the court afforded the parties the opportunity to address this decision during oral argument scheduled on April 15, 2002. Due to a problem with notice of the scheduled oral argument, it was rescheduled for May 13, 2002. Both motions are now ripe for disposition.

---

1. Judge Horn was unavailable due to medical problems.

## LEGAL STANDARD

Under the Pennsylvania Rules of Civil Procedure, summary judgment is proper in two instances. First, a moving party is entitled to summary judgment where "there is no genuine issue of any material fact as to a necessary element of the cause of action or defense which could be established by discovery or expert report" Pa.R.C.P. 1035.2(1). A motion for summary judgment may only be granted when the pleadings, depositions, answers to interrogatories, admissions and affidavits, and expert witness reports demonstrate that there is "no genuine issue of any material fact as to a necessary element of the cause of action or defense" and the moving party is entitled to judgment as a matter of law. *Schroeder v. PennDOT,* 551 Pa. 243, 247, 710 A.2d 23, 25 (1998); Pa.R.C.P. 1035.1 et seq.

Second, summary judgment is also warranted if, after completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense to submit the question to a jury. Pa.R.C.P. 1035.2(2). Under the second standard, a non-moving party must produce sufficient evidence on an issue essential to the case on which he bears the burden of proof such that a jury could return a verdict in his favor. *Ertel v. Patriot-News Co.,* 544 Pa. 93, 101-102, 674 A.2d 1038, 1042 (1996). "Failure to adduce this evidence establishes that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Id.* at 102, 674 A.2d at 1038.

The record should be examined in the light most favorable to the non-moving party and summary judgment should only be granted where the entitlement to judgment as a matter of law is free and clear of doubt. *Electronic Laboratory Supply Co. v. Cullen,* 712 A.2d 304, 307 (Pa. Super. 1998). The court must give the non-moving party the benefit of all reasonable inferences which may be drawn from the facts. *Spain v. Vicente,* 315 Pa. Super. 135, 139, 461 A.2d 833, 835 (1983).

Moreover, it is not part of the court's function to decide issues of fact, but to determine whether there is an issue of fact to be tried. *Helinek v. Helinek,* 337 Pa. Super. 497, 499, 487 A.2d 369, 371 (1985); *Wilk v. Haus,* 313 Pa. Super. 479, 482, 460 A.2d 288, 290 (1983). It is often the case that although the basic facts are not in dispute, the parties in good faith may nevertheless disagree about the inferences to be drawn from these facts; *e.g.,* what the intention of the parties was as shown by the facts. The Superior Court has determined that "[u]nder such circumstances the case *is not one* to be decided by the trial judge on a motion for summary judgment." *Helinek,* 337 Pa. Super. at 500, 487 A.2d at 371 (emphasis in original); see also, *Christman v. Dravo Corporation,* 319 Pa. Super. 378, 380, 466 A.2d 209, 210 (1983) (quoting *Wilk,* 313 Pa. Super. at 482, 460 A.2d at 290).

## DISCUSSION

Plaintiff's motion for partial summary judgment and defendant's cross-motion for summary judgment raise two issues under the umbrella of the standard for insurance bad faith. The first issue is whether the representation of Tony Schoffstall by Attorney Dorer, a staff trial

attorney for Nationwide, constitutes the unauthorized practice of law on the part of Nationwide. While Mr. Schoffstall raises other theories and factual bases for bad faith, he argues that if such conduct constitutes the unauthorized practice of law, then such should constitute per se bad faith under 42 Pa.C.S. §8371. The second issue is whether, viewing the record in the light most favorable to the plaintiff, the plaintiff can submit this bad faith action to a jury. In any event, this court must begin by examining the standards for bad faith.

Before the Supreme Court's decision in *The Birth Center v. The St. Paul Companies Inc.,* 567 Pa. 386, 787 A.2d 376 (2001), Pennsylvania appellate courts had held that, in first-party actions, there is no common-law remedy for bad faith on the part of insurers. *Terletsky v. Prudential Property and Casualty Insurance Co.,* 437 Pa. Super. 108, 124, 649 A.2d 680, 688 (1994) (citing *D'Ambrosio v. Pennsylvania National Mutual Casualty Insurance Company,* 494 Pa. 501, 507, 431 A.2d 966, 970 (1981)). The exclusive basis for a cause of action was under 42 Pa.C.S. §8371 which provides:

"In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

"(1) Award interest on the amount of the claim from the date the claim was made by the insured in the amount equal to the prime rate of interest plus 3 percent.

"(2) Award punitive damages against the insurer.

"(3) Assess court costs and attorney fees against the insurer."

However, in *Birth Center,* the Supreme Court clarified its decision in *D'Ambrosio* stating that "where the allegations in the complaint failed to show how the insurer acted in bad faith, we would not allow the insured to recover punitive damages or damages for emotional distress on his *trespass* cause of action." *Id.* at 401, 787 A.2d at 385. (emphasis in original) The Supreme Court added, "In fact, we expressly stated that, in an appropriate case, an insured could recover compensatory damages based on a contract cause of action, because of an insurer's bad faith conduct . . ." *Id.* The Supreme Court went on to hold that section 8371 does not alter common-law contract rights to seek compensatory damages despite the fact that such damages are not mentioned in the statute. *Id.* at 401-402, 787 A.2d at 386. Thus, a party may proceed with bad faith insurance claims under section 8371 or under common-law contract theories.

In the case sub judice, the plaintiff is seeking damages for bad faith under section 8371. Although the legislature did not define "bad faith" within the statute, Pennsylvania courts have recognized a particular meaning for "bad faith" within the insurance context:

"Insurance. 'Bad faith' on part of insurer is any frivolous or unfounded refusal to pay proceeds of a policy; it is not necessary that such refusal be fraudulent. For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; mere negligence or bad judgment is not bad faith." *Terletsky* at 125, 649 A.2d at 688 (quoting Black's Law Dictionary 139 (6th ed. 1990)). In addition, when evaluating bad faith under section 8371, a trial court may look

to (1) other cases construing the statute and the law of bad faith in general, (2) the plain meaning of the terms in the statute, and/or (3) other statutes addressing the same or similar subjects. *MGA Insurance Co. v. Bakos,* 699 A.2d 751, 755 (Pa. Super. 1997) (citing *Romano v. Nationwide Mutual Fire Insurance Co.,* 435 Pa. Super. 545, 555, 646 A.2d 1228, 1233 (1994)). In any case, bad faith must be proven by clear and convincing evidence and not merely insinuated. *Terletsky* at 125, 649 A.2d at 688. (citations omitted)

### I. *Plaintiff's Motion for Partial Summary Judgment*

Mr. Schoffstall moves for partial summary judgment on the narrow basis that Nationwide engaged in the unauthorized practice of law in violation of 42 Pa.C.S. §2524 and that such conduct amounts to bad faith prohibited by 42 Pa.C.S. §8371. We begin by noting that 42 Pa.C.S. §2524 is clearly applicable to a corporation such as Nationwide. Subsection (a) of the statute states: "Except as provided for in subsection (b), any person, . . . , who within this Commonwealth shall practice law, or who shall hold himself out to the public as being entitled to practice law, . . . , or the equivalent in any language, in such a manner as to convey the impression that he is a practitioner of the law of any jurisdiction, without being an attorney at law or *a corporation complying with 15 Pa.C.S. ch. 29* (relating to professional corporations), commits a misdemeanor of the third degree upon a first violation." 42 Pa.C.S. §2524. (emphasis added)[2] The

2. The statute states in full as follows:

"Section 2524. Penalty for unauthorized practice of law

"(a) General rule.—Except as provided in subsection (b), any person, including, but not limited to, a paralegal or legal assistant, who

Pennsylvania Statutory Construction Act states that the term "person" includes corporations as well as partnerships, limited liability companies, business trusts, associations, government entities, estates and natural persons.

within this Commonwealth shall practice law, or who shall hold himself out to the public as being entitled to practice law, or use or advertise the title of lawyer, attorney at law, attorney and counselor at law, counselor, or the equivalent in any language, in such a manner as to convey the impression that he is a practitioner of the law of any jurisdiction, without being an attorney at law or a corporation complying with 15 Pa.C.S. ch. 29 (relating to professional corporations), commits a misdemeanor of the third degree upon a first violation. A second or subsequent violation of this subsection constitutes a misdemeanor of the first degree.

"(b) Practice by associations.—

"(1) An association does not violate subsection (a) if it provides legal services only through officers, employees or agents who are duly admitted to practice law. The association may employ persons not admitted to practice law, but those persons shall not render any legal services rendered or to be rendered by the association.

"(2) This subsection shall not be interpreted to preclude the use of clerks, secretaries, administrators, bookkeepers, technicians and other assistants who are not usually and ordinarily considered by law, custom and practice to be rendering legal services, nor to preclude the use of any other person who performs all his employment under the direct supervision and control of a person duly admitted to practice law. A person shall not, under the guise of employment, render legal services unless duly admitted to practice law.

"(3) Notwithstanding any other provision of law, an association may charge for the legal services of its officers, employees and agents, may collect those charges and may compensate those who render the professional services.

"(c) Injunction—In addition to criminal prosecution, unauthorized practice of law may be enjoined in any county court of common pleas having personal jurisdiction over the defendant. The party obtaining such an injunction may be awarded costs and expenses incurred, including reasonable attorney fees, against the enjoined party. A violation of subsection (a) is also a violation of the Act of December 17, 1968 (P.L. 1224, no. 387), known as the Unfair Trade Practices and Consumer Protection Law." 42 Pa.C.S. §2524.

See 1 Pa.C.S. §1991. In addition, the phrase "without being an attorney at law or a corporation complying with 15 Pa.C.S. ch. 29" indicates, necessarily, that a corporation not in compliance with the Professional Corporation Law that practices law would be in violation of the statute.

Nationwide argues that, even though the unauthorized practice of law statute is applicable to it, Mr. Schoffstall lacks standing to bring a claim under it. The defendant points to the fact that the statute is criminal in nature and the proper way to "prosecute" a crime in Pennsylvania is for the alleged victim of such conduct to seek the issuance of a criminal complaint by the proper issuing authority. See Pa.R.Crim.P. 65. We reject this contention.

In this case, the plaintiff is not seeking to prosecute Nationwide for any criminal conduct under the above statute. Rather, the plaintiff is asserting that a per se violation of this statute constitutes per se bad faith on the part of the defendant in violation of 42 Pa.C.S. §8371. This litigation is a civil matter, not a criminal prosecution. Therefore, the court finds this argument without merit.

We then consider whether a violation of the unauthorized practice of law statute would constitute bad faith as prohibited by 42 Pa.C.S. §8371. As noted above, the court is authorized to examine other statutes addressing the same or similar subjects regarding bad faith. For example, the Superior Court has held that the parameters of section 8371 may be discerned by reference to analogous Pennsylvania insurance law. *Romano,* 435 Pa. Super. at 555, 646 A.2d at 1233. The *Romano* court relied on section 1921 of the Statutory Construction Act which states:

"when the words of a statute are not explicit, the intention of the General Assembly may be ascertained by considering among other matters . . . (5) . . . other statutes upon the same or similar subjects." 1 Pa.C.S. §1921. In *Romano,* the specific provision the Superior Court considered was section 1171.5 of the Unfair Insurance Practices Act that defines unfair methods of competition and unfair or deceptive acts or practices in the business of insurance. *Id.*

In light of the *Romano* decision, the court is inclined to agree with Mr. Schoffstall that a violation of the Unauthorized Practice of Law Statute §2524, would constitute bad faith in violation of section 8371. The unauthorized practice of law constitutes criminal conduct within the Commonwealth of Pennsylvania. If an insurer engages in such criminal conduct detrimental to the insured, the court has little difficulty finding that such conduct is bad faith. A blatant example would be a claims adjuster for an insurer giving legal advice to an insured. However, we must consider the more precise and difficult question of whether an insurer engages in the unauthorized practice of law when it uses staff trial attorneys to represent policyholders.

Mr. Schoffstall argues that, as a matter of law, Nationwide engaged in the unauthorized practice of law in violation of 42 Pa.C.S. §2524 because, the argument goes, Pennsylvania law prohibits corporations from engaging in the practice of law and the use of staff attorneys to negotiate and litigate claims on behalf of its insureds against third parties is tantamount to the practice of law by the corporation. Pennsylvania courts have not ruled on the precise issue of whether an insurance company

engages in the unauthorized practice of law when it uses staff trial attorneys to represent policyholders.

Mr. Schoffstall relies heavily upon the decision in *Gardner v. North Carolina State Bar,* 341 S.E.2d 517 (N.C. 1986), where the North Carolina Supreme Court held that permitting a licensed attorney who is a full-time employee of an insurance company to represent the company's insured violated North Carolina's statutory ban on the practice of law by corporations.[3] In *Gardner,* the decision of the North Carolina Supreme Court turned on the interpretation of a statute. That statute stated "It shall be unlawful for any corporation to practice law or appear as an attorney for any person in any court in this state. . . ." *Id.* at 520. A second statute defined "practice of law" as performing any legal service for any other person, firm, or corporation, with or without compensation. *Id.*

The court found that a corporation would be making an appearance when one of its employee-attorneys made an appearance on behalf of an insured. *Id.* The *Gardner* decision relied on the proposition that the performance of legal services by a corporation's employees are acts of the corporation itself. *Id.* at 520. The court relied on its prior decision in *State v. Pledger,* 257 N.C. 634, 127 S.E.2d 337 (1962). There, the court held that a corpora-

---

3. Mr. Schoffstall also cites *American Insurance Association v. Kentucky Bar Association,* 917 S.W.2d 568 (Ky. 1996). In that case, the Supreme Court of Kentucky refused to exercise its supervisory authority in order to review an unauthorized practice of law opinion that prohibited liability insurers from using salaried attorneys to defend claims against insureds. The court relied on precedent that stated a corporation cannot practice law. *Id.* at 571.

tion's non-attorney employee did not engage in the unauthorized practice of law when, in the course of his employment, he prepared a legal document in connection with a business transaction where the corporation has a primary interest because his acts were the acts of the corporation in furtherance of its business. The *Gardner* court found *Pledger* turned on the fact that the corporation was a party to the transaction and is not authority for the proposition that a corporation may appear in court on behalf of someone else. *Id.* at 521.

The *Gardner* court then cited a previous decision that stood for the broad proposition that a corporation could not perform legal services for others. 341 S.E.2d at 521, citing *Seawell v. Carolina Motor Club,* 209 N.C. 624, 631, 184 S.E. 540, 544 (1936). In reaffirming this proposition, the *Gardner* court rejected the argument that *Motor Club* merely stood for the proposition that a corporation cannot perform legal services for others when it has no interest in a particular transaction or proceeding. *Id.* at 521. In *Gardner,* the insurance company had appeared on behalf of another; thus, falling within the ban under the North Carolina statute.

In turn, Nationwide points to authority from many other jurisdictions in support of the opposite conclusion.[4] It specifically cites to the decision of the Supreme Court of Missouri in *In re Allstate Insurance Company,* 722

---

4. Nationwide argues that Mr. Schoffstall ignores precedent from 19 states and the American Bar Association in support of its position. Some of the precedent cited to this court includes *Cincinnati Insurance Co. v. Wills,* 717 N.E.2d 151 (Ind. 1999); *In re Petition of Youngblood,* 895 S.W.2d 322 (Tenn. 1995); and, *In re Rules Concerning the Conduct of Attorneys in Florida,* 220 So.2d 6 (Fla. 1969).

S.W.2d 947 (Mo. banc 1987), which specifically rejected the reasoning in *Gardner.* There, the court held that an insurance corporation does not engage in the unauthorized practice of law when its attorney-employees prepare pleadings and appear in court in defense of insureds. The court interpreted the Missouri unauthorized practice of law statute which reads as follows:

"No person shall engage in the practice of law or do law business, as defined in section 484.010, or both, unless he shall have been duly licensed therefor and while his license therefor is in full force and effect, nor shall any corporation, except a professional corporation, organized pursuant to the provisions of chapter 356, RSMo, engage in the practice of law or do business as defined in section 484.010, or both." *Id.* at 949.[5]

The court relied on its decision in *State ex rel. McKitrick v. C.S. Dudley & Co.,* 340 Mo. 852, 102

---

5. The Missouri statute defined "practice of law" as follows: (1) The "practice of law" is hereby defined to be and is the appearance as an advocate in a representative capacity or the drawing of papers pleadings or documents or the performance of any act in such capacity in connection with proceedings pending or perspective before any court of record, commissioner, referee or any body, board, committee or commission constituted by law or having authority to settle controversies. *In re Allstate,* 722 S.W.2d at 949.

The same statute defined "law business" as follows: (2) The "law business" is hereby defined to be and is the advising or counseling for valuable consideration of any person firm association, or corporation as to any secular law or the drawing or the procuring of or assisting in the drawing for a valuable consideration of any paper, document or instrument affecting or relating to secular rights or the doing of any act for a valuable consideration in a representative capacity, obtaining or tending to obtain or securing or tending to secure for any person, firm, association, or corporation any property or property rights whatsoever.

S.W.2d 895 (1937), where it had held that an incorporated collection agency who retained private attorneys to bring suit on debts was practicing law because it received a percentage of the fees charged by the attorneys. The court stated the primary purpose of the above statute is to preclude a corporation with nonprofessional shareholders from having a proprietary interest in or sharing in the emoluments of a law practice. *In re Allstate,* 722 S.W.2d at 950. In light of this purpose for the statute, the court reasoned that it makes no difference whether employed lawyers or independent contractors render the legal services. *Id.*

The crux of the issue regarding the staff trial attorneys representing insureds, in the view of this court, is the potential for an insurer to have undue influence over the staff trial attorney to the detriment of the attorney client relationship with the insured. During oral argument on the pending motions on May 13, 2002, counsel for Mr. Schoffstall cited for the first time *Neill v. Gimbel Brothers Inc.,* 330 Pa. 213, 199 A. 178 (1938), which considered the conflicts of interest when licensed professionals are under control of a corporation.

In *Neill,* a group of optometrists brought an equity action against Gimbel Brothers Inc., a department store, seeking to prohibit it from employing licensed optometrists to examine the eyes of its customers. Gimbel Brothers had leased part of its store to a partnership for an optical department for the examination of eyes and the fitting and supplying of glasses. Though the optometrist in charge and other employees were employees of the partnership, they were under control of Gimbel Brothers. In addition, all bills rendered for examinations were

in the name of Gimbel Brothers. Gimbel Brothers was not licensed to practice optometry and, as a New York corporation, did not have the right to practice.

The lower court declined to enjoin Gimbel Brothers as requested, holding that 63 P.S. §§231-244 (relating to optometry, repealed June 6, 1980, P.L. 197, no. 57 §12) did not make it unlawful for a licensed and duly registered optometrist to contract with an individual, firm or corporation to examine the eyes of such patrons as may request it. However, the Supreme Court rejected this reasoning, deciding to follow the Supreme Judicial Court of Massachusetts's decision in *McMurdo v. Getter,* 10 N.E.2d. 139 (1937), which it quoted extensively. The rule, enunciated by *McMurdo,* and followed by the Supreme Court in *Neill,* is as follows:

"The rule is generally recognized that a licensed practitioner of a profession may not lawfully practise his profession among the public as the servant of an unlicensed person or corporation; and that, if he does so, the unlicensed person or corporation employing him is guilty of practising that profession without a license. A corporation as such cannot possess the personal qualities required of a practitioner of a profession. *Its servants, though professionally trained and duly licensed to practise, owe their primary allegiance and obedience to their employer rather than to the clients or patients of their employer. The rule stated recognizes the necessity of immediate and unbroken relationship between a professional man and those who engage his services.* It was applied recently in this Commonwealth in the case of lawyers." *Neill* at 219, 199 A. 181. (emphasis added)

Thus, it is clear that the Supreme Court believed that when a corporation employed a professional, the professional's allegiance would always favor their employer's interests to the detriment of the interests of the client of the professional.

We reject the rationale of the Supreme Court in *Neill* as not applicable in the narrow case of a staff trial attorney employed by an insurance company to represent insureds and decline to extend its holding by analogy to this case. There is a distinction to be made with regard to staff trial attorneys employed by insurers and professionals employed by non-professional corporations in other contexts.[6] This distinction was articulated in a recent California decision that is directly on point. *Gafcon v. Ponsor & Associates,* 2002 WL 1175009, 7 (Cal. App. 4 Dist. 2002). The California court recognized, "[w]hen an insurance company in California arranges for a law firm to defend an insured under a contractual duty to do so under an insurance policy (regardless of whether that law firm is retained by outside counsel or in-house counsel employed by the insurer), counsel is acting on the insurer's behalf and representing the insurer's own rights and interests as well as those of its insured." *Id.* at 7. The court further stated:

"It is sufficient here to recognize (1) an insurance company has a direct pecuniary interest in the underlying

---

6. If in 1938, and indeed given the reference in dicta in *Neill* at 221 to a corporation hiring a lawyer to render legal services, we might not have attempted any distinction and left it to our appellate court to explain; however, the evolution of our learned profession as practiced in the modern context of mandatory automobile insurance and extensive ethical rules for in-house counsel requires a current analysis of this issue.

third party action against its insured and (2) having such an interest, it is entitled to have counsel represent its own interests as well as those of its insured, as long as their interests are aligned. In the present situation, the insurer is representing its own interests through licensed attorneys who also happen to be its employees. Counsel's status as a salaried employee of the insurer does not inherently create a temptation to violate or disregard ethical rules. We reject the argument that such a relationship supports the presumption that in-house counsel will always favor the insurer's interests. Conflicts of interests may arise in such circumstances, but the same is true for an outside law firm that might be dependant upon a particular insurance company for a substantial amount of business." *Id.* at 12.

Thus, the distinction recognized today is that an attorney engaged by an insurer to represent an insured under the terms of an insurance policy represents both the insurer's interests as well as the insured's interests.

The California courts recognized the potential conflict of interest between insureds and insurers. California is not alone as courts in Pennsylvania have long recognized the inherent conflict of interest between an insurance company and an insured, especially once an offer to settle within policy limits has been received. See *Shearer v. Reed,* 286 Pa. Super. 188, 196, 428 A.2d 635, 639 (1981). However, such conflicts of interests, as was the stated concern of the Pennsylvania Supreme Court in the *Neill* case, cannot be avoided by the blanket rule that an insurer may not use staff trial attorneys to represent insureds. We believe this is so, because an attorney may favor the interests of the insurer regardless of

whether the attorney is an employee or an independent contractor who depends greatly on the insurer for a substantial amount of business. In any case, it is the responsibility of the attorney to see that this does not happen.

The court finds Pennsylvania Bar Association formal opinion 96-196, entitled Ethical Concerns of Staff Trial Lawyers with Comments Appropriate to All Insurance Defense Counsel to be instructive to staff trial attorneys employed by insurers. The opinion listed several ethical considerations of attorneys employed by insurers. The factors are:

"(1) Does the staff trial attorney maintain independent professional judgment in all phases of the representation of the insured?

"(2) To what degree are there restrictions, imposed by the insurance company employer, upon the staff trial lawyer in either the scope of the representation of the insured-client or upon the strategy and tactics involved in the representation?

"(3) Is there a contract between the insurance company and the insured-client which imposes upon the insurance company a duty to indemnify the insured—giving rise to an interest in the litigation held by the insurance company—and a duty to defend the insured?

"(4) Is there a direct financial benefit to the insurance company in staff trial lawyer's representation of the client?" Pa. Bar Association formal opinion 96-196 at 10-11. These factors address all of Pennsylvania's concerns regarding the unauthorized practice of law in the context of staff attorneys of insurance companies representing insureds. The first and second factors look to see

whether the insurance company has interfered with the legal judgment of the staff trial attorney. The third factor examines the nature of the contractual relationship between the insured and the insurance company. The fourth factor addresses whether the arrangement between the staff trial attorneys and the insurance company would result in prohibited fee splitting with non-lawyers.

Therefore, Nationwide's use of staff trial attorneys did not and does not amount to the unauthorized practice of law, and, as such, Nationwide has not engaged in the unauthorized practice of law. Having so concluded, plaintiff Tony Schoffstall's motion for partial summary judgment will be denied.

## II. *Defendant's Cross-Motion for Summary Judgment*

Conversely, Nationwide seeks summary judgment on the ground that the record examined in the light most favorable to Mr. Schoffstall fails to reveal that it had acted in bad faith in handling the underlying matter in this case on any basis alleged by Mr. Schoffstall.

The first issue is whether Nationwide's decision not to settle the underlying claim within policy limits was reasonable, thereby precluding recovery under a bad faith claim. Though the standard for bad faith under section 8371 contemplates bad faith in refusing to pay claims, the Superior Court has applied it to insurance companies that have acted in bad faith in refusing to settle a third-party claim within policy limits. See *The Birth Center v. The St. Paul Companies Inc.*, 727 A.2d 1144 (Pa. Super. 1999), *affirmed by The Birth Center v. The*

*St. Paul Companies Inc.,* 567 Pa. 386, 787 A.2d 376 (2001). The Superior Court in *Birth Center* recognized that an insurance company undertakes certain duties apart from those enumerated in 42 Pa.C.S. §8371. Specifically, under an insurance contract an insurer agrees to indemnify against liability covered by the policy, to defend against all claims filed by an injured party that may potentially come within coverage of the policy and to assume a fiduciary responsibility towards the insured and, as such, becomes obligated to act in good faith and with due care in representing the interests of its insured when handling all third party claims brought against the insured. *Birth Center,* 727 A.2d at 1155. Indeed, the Supreme Court has ruled that an insurer may not avoid liability for bad faith merely by paying the amount of the excess verdict. *Birth Center,* 567 Pa. at 400, 787 A.2d at 385.

The standard used when considering an insurance company's decision to litigate or settle a third party claim brought against its insured is explained in *Shearer v. Reed,* 286 Pa. Super. 188, 428 A.2d 635 (1981):

"[A] decision . . . must be a thoroughly honest, intelligent and objective one. It must be a realistic one when tested by the necessarily assumed expertise of the company. . . . This expertise must be applied, in a given case, to a consideration of *all the factors* bearing on the advisability of a settlement for the protection of the insured. *While the view of the carrier or its attorney as to liability is one important factor, a good faith evaluation requires more.* It includes consideration of the anticipated range of a verdict, should it be adverse; the strengths and weaknesses of all of the evidence to be presented on

either side so far as known; the history of the particular geographic area in cases of similar nature; and the relative appearance, persuasiveness, and likely appeal of the claimant, the insured, and the witnesses at trial." *Shearer* at 194, 428 A.2d at 638. (citations omitted) (emphasis in original)

This standard compels an insurer to make an intelligent and objective appraisal of each case by considering all the factors bearing upon the advisability of settlement. *Birth Center,* 727 A.2d at 1155-56. An insurer who decides to litigate a claim is not automatically liable to its insured simply because the outcome of the litigation is adverse to the insured. *Id.* Furthermore, the insurer does not have an absolute duty to settle a claim just because it is possible that a judgment against the insured may exceed the policy limits. *Id.* As stated earlier, a bad faith claim must be proven by clear and convincing evidence and not merely insinuated. *Terletsky* at 125, 649 A.2d at 688.

Nationwide argues that their decision not to settle the underlying claim was a good faith decision. It argues that it was Attorney Dorer's opinion based upon his years of trial experience that a jury would not award an amount in excess of the policy limits. More specifically, Nationwide contends that this opinion was based upon Attorney Dorer's analysis of Ms. Hannigan's injuries, most serious of which was a fractured or "winged" scapula, an IME that supported the defense position that Ms. Hannigan's injuries did not impair her functional or vocational capacity to the extent she claimed, and that Ms. Hannigan's testimony, although arousing sympathy, would be somewhat of an "oversell" to an Adams County

jury. Attorney Dorer's opinion was that a jury award in favor of Ms. Hannigan would be in the range of $30,000 to $45,000.

Mr. Schoffstall argues that there is sufficient evidence for the case to go to a jury on this point. He raises the fact that, in the jury's verdict in the underlying case, "embarrassment, humiliation, and disfigurement" accounted for $45,000 of the verdict in her favor. Mr. Schoffstall argues, based upon Attorney Dorer's evaluation of the case to Dawn Edge, an employee of Nationwide, dated August 17, 1994, that there is a reasonable inference that he had not evaluated this as a possible element of damage when he requested settlement authority of $30,000 to $45,000. Mr. Schoffstall does not set forth any other facts that would tend to establish that Nationwide acted with bad faith in refusing to settle the claim within policy limits.

Here, examining the record in the light most favorable to Mr. Schoffstall, it may be that Attorney Dorer and Nationwide misevaluated the case, but it cannot be said that this fact would amount to bad faith. Recalling the definition of bad faith: "For purposes of an action against an insurer for failure to pay a claim, such conduct imports a dishonest purpose and means a breach of a known duty (*i.e.,* good faith and fair dealing), through some motive of self-interest or ill will; *mere negligence or bad judgment* is not bad faith." *Terletsky* at 125, 649 A.2d at 688. (emphasis added) Mr. Schoffstall does not set forth any fact in the record from which a jury may infer that the refusal to settle this case was for a dishonest purpose or even that Attorney Dorer's evaluation was unreasonable. The court is not prepared to say that the

"misevaluation" of a case would prima facie give rise to a bad faith claim against the insurance company. There are no facts presented on the record that indicate Nationwide was presented with the likelihood of a verdict in excess of policy limits other than the original demand that was almost three times the amount of Ms. Hannigan's award. In addition, there are no facts that even hint, much less establish, a factual question that Nationwide did anything but engage in good faith negotiations as indicated by the increases in Nationwide's offers before trial.

This case is unlike the situation in *Birth Center* where the insurance company refused to put forth any amount for settlement and refused to negotiate at all even after three different judges recommended settlement within the policy limits. Most importantly, in *Birth Center,* the insurance company's own counsel expressed dissatisfaction and surprise that the company would not give him any authority to settle after it became obvious that the trial was going badly for the insured. The insured repeatedly requested its insurance company settle the case within its policy limits citing the potential devastating effects any verdict in excess of the policy limits could have on its continued existence. The insurance company's claims representatives responded that it tries "all of these bad baby cases . . . ." *Birth Center,* 727 A.2d at 1156. Here, there are no similar facts.

Therefore, considering the facts of record viewed in the light most favorable to Mr. Schoffstall, Nationwide's cross-motion for summary judgment on the issue of failure to settle the claim within policy limits will be granted.

The second issue is Mr. Schoffstall's claim that Nationwide "over-utilized" its trial division. To the extent such argument may be considered otherwise, there are no facts presented to establish such claimed "over-utilization." Indeed, we read plaintiff's argument not to be having too many cases but simply using staff trial attorneys for representing insureds and not limiting them to "corporate matters." Because this basis for bad faith relates to the unauthorized practice of law argument as discussed above, Nationwide's cross-motion for summary judgment as to the allegation of unauthorized practice of law as a basis for bad faith will be granted.

The third issue basis for bad faith is that Attorney Dorer failed to inform Mr. Schoffstall of the opportunity to consult independent counsel or the possibility of an excess verdict. Here, a factual question seems to exist.[7] However, such allegations, even if accepted as true by a jury, do not tend to establish bad faith on the part of Nationwide. The court believes many insurers send pro forma letters to insureds advising them to seek their own counsel when an excess verdict is possible. Here, there

7. Nationwide invariably points to undisputed deposition testimony that tends to disprove each allegation. However, as per the *Nanty-Glo* rule, oral testimony alone is generally insufficient, even if uncontradicted, to establish the absence of a genuine issue of material fact. *Nanty-Glo Boro. v. American Surety Co.,* 309 Pa. 236, 163 A. 523 (1932); *Penn Center House Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989). On the other hand, Mr. Schoffstall points to various "expert" reports particularly letters from Barbara J. Sciotti, Robert Margolis, Esq., William Hoffmeyer, Esq., and the Honorable John C. Dowling, former judge of the Court of Common Pleas of Dauphin County. Since we believe the question of bad faith is first a question of law if no factual disputes are presented, we disregard the "experts' " opinions since they create no question of fact, by merely opined what bad faith is given certain facts.

is no evidence in the record that such a letter was sent to Mr. Schoffstall, though there exists a question whether counsel told Mr. Schoffstall about such a possibility. In any event, the case evaluation was less than 50 percent exposure of the policy limits. The court is not prepared to accept a proposition that would essentially require "seek your own counsel" advice in every lawsuit or face a claim of bad faith. Here, there is no evidence that Attorney Dorer was instructed or pressured to "low ball" evaluations or any other conduct that a fact-finder could infer a dishonest purpose on the part of Nationwide. Therefore, Nationwide's cross-motion for summary judgment as to this theory of bad faith will be granted.

Finally, we now address the alleged nondisclosure and misrepresentation that Attorney Dorer is an employee of Nationwide. Mr. Schoffstall alleges that Attorney Dorer had a separate office called "Law Office of Donald R. Dorer." It is evident that all letterhead on the correspondence from Attorney Dorer mentions nothing of him being an employee of Nationwide. Mr. Schoffstall alleges that he was never told of the relationship between Nationwide and Attorney Dorer and that he was purposefully misled by the relationship. However, Mr. Schoffstall does not develop this theory by allegation independently in the complaint. Furthermore, in his briefs, such allegations were interspersed mostly in the context of his theory that the use of staff trial attorneys constitute the unauthorized practice of law.

The court notes that such conduct, if accepted as true, may be considered to be ethically improper on the part of Attorney Dorer. California, in state bar opinion no. 1987-91, listed several ethical considerations for staff

trial attorneys employed by insureds. Included among these ethical considerations is that an attorney must not use a law firm name without indicating the relationship between the firm and the law division on its letterhead. *Gafcon* at 12. However, no similar Pennsylvania rule has been cited to this court. In any event, such ethical decisions regarding Attorney Dorer, who is not a party to this suit, are not within the jurisdiction of this court, but rather with the Disciplinary Board.

Furthermore, it is not clear how these alleged misrepresentations constitute bad faith on the part of Nationwide, independent of the theory that the use of staff trial attorneys is per se bad faith. Clearly, Mr. Schoffstall knew that (1) Nationwide, under the terms of the policy, had the duty to provide a defense in the underlying action; (2) Nationwide had selected Attorney Dorer to handle his case; (3) Nationwide had the authority to evaluate the case and decide whether or not to settle (as long as such a decision was made in good faith). Attorney Dorer's ethical obligations to Mr. Schoffstall are the same whether he is an employee of Nationwide or an independent contractor. Accepting as true the facts that Mr. Schoffstall did not know the true relationship between Nationwide and Attorney Dorer and neither had taken steps to inform him, it is, nevertheless, difficult to see how he was harmed by this fact alone. While Nationwide and Attorney Dorer should be forthcoming with the true status of their relationship, should the failure to do so expose Nationwide to a bad faith claim? In light of the fact that this theory has not been developed by the plaintiff and seems to be coupled with the theory that the relationship

between Attorney Dorer and Nationwide is per se bad faith, the court finds that the answer is no. Accordingly, Nationwide's cross-motion for summary judgment as to this theory of bad faith will be granted.

Having so concluded, plaintiff Tony Schoffstall's motion for partial summary judgment will be denied and defendant Nationwide Insurance Company's motion for summary judgment will be granted. An appropriate order follows.

### ORDER

And now, June 28, 2002, for the reasons set forth in the foregoing opinion, it is hereby ordered that plaintiff Tony Schoffstall's motion for partial summary judgment is denied. It is further ordered that defendant Nationwide's cross-motion for summary judgment is granted and plaintiff's complaint is dismissed.

The prothonotary shall serve a copy of this opinion and order on all counsel of record as required by law.