**UNAUTHORIZED PRACTICE OF LAW COMMITTEE,**
Petitioner,

v.

**AMERICAN HOME ASSURANCE COMPANY, INC. and The Travelers Indemnity Company, Respondents.**

No. 04–0138.

Supreme Court of Texas.

Argued Sept. 28, 2005.

Decided March 28, 2008.

Rehearing Denied Sept. 26, 2008.

**26**

Mark A. Ticer, Roger M. Tafel, Law Office of Mark Ticer, Dallas, David E. Keltner, Kelly Hart & Hallman LLP, Fort Worth, TX, for Petitioner.

Thomas C. Wright, Lucy H. Forbes, Wright Brown & Close, LLP, Houston, Jim E. Cowles, R. Michael Northrup, Cowles & Thompson, P.C., Mark S. Whitburn, Theodore J. Boutrous Jr., Suellen Ratliff, Gibson, Dunn & Crutcher, LLP, Dallas, TX, William T. Barker, Sonnenschein, Nath & Rosenthal LLP, Chicago, IL, William V. Dorsaneo III, Richard A. Smith, Lynn Tillotson & Pinker, L.L.P., Dallas, Thomas T. Rogers, Jackson & Walker, L.L.P., Austin, TX, for Respondent.

J. Dennis Chambers, Atchley, Russell, Waldrop & Hlavinka, Texarkana, Stephen E. McConnico, Scott Douglass & McConnico, L.L.P., Patricia Anne Moore, Donald P. Wilcox, Fred C. Bosse, Austin, Thomas S. Leatherbury, Robert C. Walters, Vinson & Elkins L.L.P., Calvin R. "Rod" Phelan II, Baker Botts LLP, Dallas, Jerry P. Campbell, Naman Howell Smith & Lee, Waco, John L. Hill Jr., Winstead Scchrist & Minick, P.C., Maurice Joseph Meynier IV, Law Office of M. Joseph Meynier, IV, Houston, Julia F. Pendery, Attorney At Law, Dallas, Peter M. Kelly, Law Office of Peter M. Kelly, P.C., Houston, Guy D. Choate, Webb, Stokes & Sparks, L.L.P., San Angelo, TX, for Amicus Curiae.

Justice HECHT delivered the opinion of the Court, in which Chief Justice JEFFERSON, Justice O'NEILL, Justice WAINWRIGHT, Justice BRISTER, Justice MEDINA, and Justice WILLETT joined.

Liability insurance policies commonly provide that the insurer must indemnify the insured from liability for covered claims and give the insurer the duty, and also the right, to defend such claims. The right to defend in many policies gives the insurer complete, exclusive control of the defense. Insurance companies retain attorneys in private practice to represent insureds in defending claims against them, but for decades, in Texas and other states, insurers have also used staff attorneys— salaried company employees—to save costs.

Generally, a corporation can employ attorneys in-house to represent its own interests but cannot engage in the practice of law by providing legal representation to others with different interests. Because of its potential indemnity obligation, an insurer has a direct, substantial financial interest in defending claims against its insured, and often an insurer and an insured's interests are aligned toward simply defeating such claims. But their interests can diverge, as for example when all or part of the claim may not be covered. The issue in this case is whether a liability insurer that uses staff attorneys to defend claims against its insureds is representing its own interests, which is permitted, or engaging in the unauthorized practice of law, which is not. Two states, North Carolina and Kentucky, do not permit such use of staff attorneys, but several other states do.

█ We hold that an insurer may use staff attorneys to defend a claim against an insured if the insurer's interest and the insured's interest are congruent, but not

otherwise. Their interests are congruent when they are aligned in defeating the claim and there is no conflict of interest between the insurer and the insured. We also hold that a staff attorney must fully disclose to an insured his or her affiliation with the insurer. We modify the judgment of the court of appeals and as modified, affirm.[1]

## I

■ Liability insurance policies that obligate the insurer to defend claims against the insured typically give the insurer "complete and exclusive control" of that defense.[2] There are exceptions and variations, but we focus here on policies in which the insurer's right to control the defense is "full and absolute."[3] Insurers often retain attorneys in private practice to represent insureds, overseeing and directing their work and paying their fees.

Sometimes an insurer uses a "captive" firm of attorneys who, though not the insurer's employees, have no other clients. Insurers also use lawyers employed as salaried corporate staff to represent insureds. In every instance, the insured's lawyer "owes the insured the same type of unqualified loyalty as if he had been originally employed by the insured"[4] and "must at all times protect the interests of the insured if those interests would be compromised by the insurer's instructions."[5]

Staff lawyers perform all the legal services that private attorneys do, filing pleadings and motions, taking discovery, engaging in settlement discussions, appearing in court, and trying cases. Insurers contend that staff attorneys are significantly more efficient and economical than private attorneys and thereby reduce defense costs and premiums.[6] Insurers also

1. 121 S.W.3d 831 (Tex.App.-Eastland 2003).

2. *State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 627 (Tex.1998) ("We have recognized that a liability policy may grant the insurer the right to take 'complete and exclusive control' of the insured's defense." (quoting *G.A. Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved))).

3. *See Stowers*, 15 S.W.2d at 547.

4. *Employers Cas. Co. v. Tilley*, 496 S.W.2d 552, 558 (Tex.1973).

5. *Traver*, 980 S.W.2d at 628.

6. Michael D. Morrison & James R. Old, Jr., *Economics, Exigencies and Ethics: Whose Choice? Emerging Trends and Issues in Texas Insurance Defense Practice*, 53 Baylor L.Rev. 349, 394 (2001) ("Insurers find the use of house counsel attractive because some believe their use is less expensive than the use of independent attorneys who charge by the hour. Insurers claim that in addition to the elimination of the private attorney's profit, the relatively high level of specialization of house counsel in the nuances of the particular products offered by the insurer and the repeated

exposure to cases based upon these products offers greater efficiency which allows the insurer to provide the insured with a competent defense at a lower cost."). *See also* Brief of Amicus Curiae American Insurance Ass'n, National Ass'n of Mutual Insurance Cos., Property Casualty Insurers Ass'n of America, Ass'n of Corporate Counsel, Insurance Council of Texas, and Texas Ass'n of Business at 20 (stating that an AIA National Litigation Statistical Survey of 34 insurer groups comprising 25.5% of the property casualty market reflected that the average amount paid on cases defended by outside counsel was $34,044 for auto claims and $39,697 for other claims, while those numbers for cases defended by staff counsel were $29,807 and $21,097, respectively, excluding environmental, coverage, and extra-contractual litigation). *See generally* Charles Silver, *Flat Fees and Staff Attorneys: Unnecessary Casualties in the Continuing Battle over the Law Governing Insurance Defense Lawyers*, 4 Conn. Ins. L.J. 205, 241–242 (1997) ("As outside defense costs rose throughout the 1980s and early 1990s, more and more insurers found it advantageous to bring legal work in-house. The available evidence suggests that these insurers saved a lot of money. One company found that cases handled by outside defense lawyers

claim that the availability of staff attorneys is a useful advertising tool for selling policies. But critics of the use of staff attorneys argue that when an insurer controls the insured's attorney as thoroughly as an employer controls an employee, the attorney-client relationship can be impaired to the insured's detriment.[7] This disagreement has been the subject of lingering national debate.

There is some indication that insurers' use of staff attorneys to represent insureds dates to the end of the nineteenth century.[8] In 1950, the American Bar Association Committee on Ethics and Professional Responsibility concluded that such use of staff attorneys was not unethical,[9] and it reaffirmed that view in 2003.[10] While there appear to be no comprehen-

settled for 32 percent more money, took 45 percent longer to close, consumed 144 percent more attorney time, and cost 156 percent more in fees than similar cases handled by staff attorneys.... Another insurer's study of claims closed in 1995 found that the mean settlement size (which includes trial judgments) in cases handled by staff attorneys and outside defense counsel were roughly the same, but that outside attorneys were one and a half times as expensive as staff attorneys in automobile cases and nearly three times as expensive in other liability matters. A third insurer estimated that it saved it $26 million in 1992. In 1993, a survey of member companies of the American Insurance Association indicated that staff counsel operations saved carriers an average of $32 million annually (from a low of $10 million to a high of $72 million), that outside counsel cost 2.89 times more per case ($4,983 dollars more per case in real terms), and that indemnity costs for both groups of attorneys were roughly the same. A survey conducted by the American Corporate Counsel Association found that insurers who maintain staff counsel offices 'can secure legal services at significant cost savings, somewhere approaching 40%–50% ... by lowering overhead and removing profits.' " (footnotes omitted)).

7. *See, e.g.*, Morrison & Old, *supra* note 6, at 407 ("[T]he bottom line is that the use of house counsel takes a situation that virtually all commentators already agree is fraught with conflicts and economic tension, and adds even greater opportunity for mischief. No one wants to presume unethical conduct by any lawyer, regardless of his or her employer. Reality, however, dictates that when the source of coercion is one's sole employer, or one's only client, the potential for interference with one's judgment is far greater than in the independent counsel context. The question is how much potential interference is too much? At what point does the profession collectively

decide that avoiding even the appearance of impropriety is sufficiently important to prohibit certain practices?" (footnote omitted)).

8. *See* Silver, *supra* note 6, at 237 ("Liability insurance companies began using staff attorneys to defend lawsuits against policyholders at least a century ago.") (citing Affidavit of Oliver B. Dickins, Jr., Deputy General Counsel of the Travelers Insurance Company (Oct. 27, 1993) ("Travelers actually began its staff counsel program in 1892 in Metropolitan New York and has had experience in that location with staff counsel since that time")).

9. ABA Comm. on Ethics and Prof'l Reponsibility, Formal Op. 282 (1950) ("A lawyer, employed and compensated by an automobile insurance company, which holds a standard contract of insurance with an insured, may with propriety: A. Defend the insured in an action brought by a third party without making any charge to the insured; B. Prosecute an action for the insured against a third party, upon a fee basis, along with a subrogation action by the insurance company; C. Defend for a fee a person sued in a 'Public Liability and Property Damage' action brought by a third party when at the same time he represents the 'Collision' insurance company and the insured in a cross-action against such third party.").

10. ABA Comm. on Ethics and Prof'l Reponsibility, Formal Op. 03–430 (2003) ("[T]he Committee reaffirms its prior opinions and concludes that insurance staff counsel ethically may undertake such representations so long as the lawyers (1) inform all insureds whom they represent that the lawyers are employees of the insurance company, and (2) exercise independent professional judgment in advising or otherwise representing the insureds.").

sive industry studies on the matter,[11] it is safe to say that the practice is now, and has long been, widespread.[12] The same is true in Texas. A 1963 opinion of the State Bar of Texas Committee on Interpretation of the Canons of Ethics recognized insurers' use of staff attorneys to defend claims against insureds and found nothing improper in the practice.[13] An amicus curiae brief in this case, submitted by five insurers who use staff attorneys to defend insureds, states that fifteen insurers employ 220 staff attorneys in Texas in 39 offices.[14] Another amicus curiae brief, received from

insurance, corporate counsel, and business interests, estimated that in September 2005, over 10,000 cases in Texas were being defended by staff attorneys.[15]

The practice of law in Texas is regulated by this Court and by the Legislature.[16] To practice law in Texas, one must either be licensed by the Court[17] or have special permission.[18] To ensure the quality and integrity of the bar, the Court requires continuing education[19] and imposes strict disciplinary rules,[20] enforced through the grievance process.[21] To further protect

11. *See* Silver, *supra* note 6, at 238 (stating that "[i]ndustry-wide statistics are not available").

12. *See id.* at 238 n. 105 (citing INSURANCE SERVICES OFFICE, INC., LEGAL DEFENSE: A LARGE AND STILL GROWING INSURANCE COST [ISO INSURANCE ISSUES SERIES] 14–15 (1992) (stating that an ISO DATA, Inc. study of claims closed in either the third-quarter of 1990 or the first quarter of 1991 found that 22% of all claims were referred to in-house lawyers)); *id.* at 238–239 n. 108 (citing James Howland & Michael Pritula, *Legal Costs: Can the Flow Be Slowed?*, BEST'S REV.-PROP.-CAS. INS. ED., Feb. 1991, at 14 (stating that "Cigna and Liberty Mutual have more than doubled their staff counsel operations in the past decade," and that "[c]arriers like Allstate and The Travelers report that staff counsel handles well over half of their litigated cases")); *id.* at 239–240 (citing a private survey showing that "13 companies employed more than 3,000 attorneys and maintained more than 400 offices in fiscal 1997"); Morrison & Old, *supra* note 6, at 394 (noting that the private survey conducted by Professor Silver shows that the use of staff attorneys "is well established among a significant number of insurance companies and is in fact a growth industry").

13. Comm. on Interpretation of the Canons of Ethics, Op. 260 (1963).

14. Brief of Amicus Curiae Allstate Insurance Co., USAA, Zurich American Insurance Co., Progressive Casualty Insurance Co., and Liberty Mutual Insurance Co. at 2.

15. Brief of Amicus Curiae American Insurance Ass'n, National Ass'n of Mutual Insur-

ance Cos., Property Casualty Insurers Ass'n of America, Ass'n of Corporate Counsel, Insurance Council of Texas, and Texas Ass'n of Business at 2.

16. *In re Nolo Press/Folk Law, Inc.,* 991 S.W.2d 768, 769–770 (Tex.1999) (orig.proceeding) ("The Supreme Court of Texas has inherent power to regulate the practice of law in Texas for the benefit and protection of the justice system and the people as a whole. The Court's inherent power is derived in part from Article II, Section 1 of the Texas Constitution ... [and] is assisted by statute." (footnotes omitted)).

17. *See* TEX. GOV'T CODE § 81.051(a) ("The state bar is composed of those persons licensed to practice law in this state").

18. *E.g.* TEX.R. GOVERN. BAR ADM'N XIV (foreign legal consultants), XIX (pro hac vice); RULES AND REGULATIONS GOVERNING THE PARTICIPATION OF QUALIFIED LAW STUDENTS AND QUALIFIED UNLICENSED LAW SCHOOL GRADUATES IN THE TRIAL OF CASES IN TEXAS (law students and unlicensed graduates).

19. TEX. STATE BAR R. art. XII, §§ 1–13, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtitle G, app. A (Vernon 2008).

20. TEX. DISCIPLINARY R. PROF'L CONDUCT 1.01–8.05, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtitle G, app. A (Vernon 2008) (TEX. STATE BAR R. art. X).

21. TEX.R. DISCIPLINARY P. 1.01–15.11, *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtitle G, app. A–1 (Vernon 2008).

the public, we have established and appointed the Unauthorized Practice of Law Committee to be responsible for investigating and prosecuting the unauthorized practice of law.[22]

In 1998, the Committee sued Allstate Insurance Co., alleging that its use of staff attorneys to defend insureds against liability claims constituted the unauthorized practice of law.[23] The action prompted Nationwide Mutual Insurance Co. to sue in federal court for a declaration that Texas law did not prohibit its use of staff attorneys to represent insureds, but if it did, it violated the United States Constitution.[24] The federal district court decided that abstention was required under the *Pullman* doctrine [25] and dismissed the case, and the Fifth Circuit affirmed in substance.[26] After surveying Texas caselaw and the provisions of the State Bar Act on which the Committee relied, the Circuit concluded:

we believe that the law is fairly susceptible to a reading that would permit Nationwide to employ staff counsel on behalf of its insureds. While the Texas courts certainly may decide that Nationwide's staff attorneys are engaged in the unauthorized practice of law, we believe that the law is uncertain enough on this issue that we should abstain from ruling on its federal constitutionality.[27]

Nationwide then sued the Committee in state court and obtained a favorable judgment, affirmed on appeal, which the Committee petitioned this Court to review while the present case has been pending.[28]

Meanwhile, in August 1999, a staff attorney for American Home Assurance Co., Katherine D. Woodruff, received a letter from the Committee's Dallas subcommittee stating that it was investigating whether she and her firm, Woodruff & Associates, all staff attorneys employed by American Home, were engaged in the unauthorized

**22.** *In re Nolo Press,* 991 S.W.2d at 771–772; Order Approving Rules For The Unauthorized Practice of Law Committee, Misc. Docket No. 07–9197, Section 2 (Tex. Nov. 27, 2007) (available from the Supreme Court of Texas website) (providing that the Committee is comprised of nine members appointed by the Court and stating: "The Committee shall keep the Court and the State Bar informed with respect to the unauthorized practice of law by laypersons and lay agencies and the participation of attorneys therein, and concerning methods for the prevention thereof. The Committee shall seek the elimination of the unauthorized practice by action and methods as may be appropriate for that purpose, including the filing of suits in the name of the Committee."); Tex. Gov't Code §§ 81.103(a) ("The unauthorized practice of law committee is composed of nine persons appointed by the supreme court."), 81.104 ("The unauthorized practice of law committee shall: (1) keep the supreme court and the state bar informed with respect to: (A) the unauthorized practice of law by lay persons and lay agencies and the participation of attorneys in that unauthorized practice of law; and (B) methods for the prevention of the unauthorized practice of law; and (2) seek

the elimination of the unauthorized practice of law by appropriate actions and methods, including the filing of suits in the name of the committee.").

**23.** *Unauthorized Practice of Law Comm. v. Collins,* No. 98–8269 (298th Dist. Ct., Dallas County, Tex.).

**24.** *Nationwide Mut. Ins. Co. v. Unauthorized Practice of Law Comm.,* 283 F.3d 650, 651 (5th Cir.2002).

**25.** *Railroad Comm'n of Tex. v. Pullman Co.,* 312 U.S. 496, 501–02, 61 S.Ct. 643, 85 L.Ed. 971 (1941).

**26.** *Nationwide,* 283 F.3d at 657. The circuit reversed the district court's dismissal with prejudice and remanded for dismissal without prejudice.

**27.** *Id.* at 655.

**28.** *Unauthorized Practice of Law Comm. v. Nationwide Mut. Ins. Co.,* 155 S.W.3d 590 (Tex. App.-San Antonio 2004, pet. pending) (No. 05–0130).

practice of law. Shortly thereafter, American Home, Woodruff, Woodruff & Associates, and Travelers Indemnity Co. brought this action against the Committee for a declaration that "neither the insurance companies' employment of staff counsel nor the attorneys' practice as staff counsel constitutes the unauthorized practice of law". The Committee counterclaimed for declaratory and injunctive relief. After all claims by and against Woodruff and Woodruff & Associates were nonsuited, the trial court denied American Home's and Travelers' motions for summary judgment, and granted summary judgment for the Committee, declaring that each company's "use . . . of staff counsel who are employees . . . to defend insureds (third parties) in Texas is the unauthorized practice of law". The trial court suspended its judgment pending appeal, conditioned on American Home's and Travelers' adoption of the following policy:

> If in the course of representing a party insured by [American Home and Travelers] any staff counsel employed in Texas by [such insurer, respectively] seeks advice about a potential conflict of interest between the insured and the insurance company, or any other question of professional ethics, such staff counsel will first consult with the Texas-licensed lawyer who is head of the staff counsel office, and thereafter, if the staff counsel's concerns are not resolved, consult with an outside Texas firm, designated by [such insurer, respectively], on such question.

The court of appeals reversed, rejecting all of the Committee's arguments.[29] The court reached the following conclusions:

- An insurer's right, as an employer, to control the details of its employees' work does not create an irreconcilable conflict with the interests of an insured represented by a staff attorney. Legally, an employer does not control a professional employee's judgment, and practically, a staff lawyer faces no more or different conflicts than an outside lawyer.[30]

- Insurance companies' use of staff lawyers does not violate Texas Disciplinary Rules of Professional Conduct 1.05 (Confidentiality of Information); 1.06 (Conflict of Interest: General Rule); 2.02 (Evaluation [of a Client Matter] for Use by Third Persons); 5.04(c) & (d) (Professional Independence of a Lawyer); 5.05 (Unauthorized Practice of Law); 7.06 (Prohibited Employment); 8.03 (Reporting Professional Misconduct); and 8.04 (Misconduct).[31]

- Although this Court has stated that an insurance defense lawyer "owes unqualified loyalty to the insured",[32] "[t]hat statement was dicta and does not preclude the insurer being a client, at least when there is no conflict. . . . Reality and common sense dictate that the insurance company is also a client." A company that employs lawyers to represent its own interests is not engaged in law practice, and the situation is no different when such lawyers also represent insureds with like interests, even though conflicts may arise and must be addressed.[33]

**29.** 121 S.W.3d 831, 833, 846 (Tex.App.-Eastland 2003).

**30.** *Id.* at 836.

**31.** *Id.* at 837.

**32.** *State Farm Mut. Auto. Ins. Co. v. Traver,* 980 S.W.2d 625, 628 (Tex.1998).

**33.** 121 S.W.3d at 838–839.

- An insurer's use of staff attorneys to defend insureds does not violate article art. 2.01B(2) of the Texas Business Corporation Act or chapter 81 of the Texas Government Code because an insurer's contractual duty to defend is collateral to its purpose of providing insurance. If using staff lawyers is practicing law, so is hiring outside lawyers.[34]

- Although read literally section 38.123 of the Texas Penal Code would prohibit an insurer's use of staff attorneys, it would also prohibit insurance defense altogether, an absurd result. Further, nothing in the legislative history of that 1993 statute indicates its purpose was to prohibit insurers from using staff attorneys. Therefore, the statute should not be given that effect.[35]

- Only two states, North Carolina and Kentucky, prohibit insurers from using staff attorneys, while several other states do not.[36]

The court of appeals rendered judgment for American Home and Travelers and remanded the case to the trial court to determine whether they should recover attorney fees from the Committee. Not having requested attorney fees in the trial court, American Home and Travelers concede in this Court that they are not entitled to recover them on remand. The Committee's appeal thus presents two issues:

*First:* in using staff attorneys to discharge their contractual duty to defend insureds against liability claims, are American Home and Travelers engaging in the unauthorized practice of law?

*Second:* if not, must a staff attorney's affiliation with an insurer be fully disclosed to the insured?

Several amicus curiae briefs[37] address whether, as a matter of policy, insurers' use of staff attorneys to defend claims against insureds is beneficial or detrimental to consumers, the bar, and the public. The amicus briefs also explore and question the motives insurers and lawyers may have in supporting or opposing the use of staff attorneys. These are all important matters, but they are properly addressed to the Court's administrative function in regulating the practice of law in Texas, not to its adjudicative function in deciding the legal issues presented by this case.[38] We consider and decide here only what the unauthorized practice of law *is,* under existing law, not what it *should be,* an issue that must be left to another process.

---

34. *Id.* at 839–842.

35. *Id.* at 842–843.

36. *Id.* at 843–845.

37. Amici submitting briefs in support of the Committee are the Texas Ass'n of Defense Counsel, the Texas Medical Ass'n, and the Texas Trial Lawyers Ass'n. Amici submitting briefs in support of the insurers are Allstate Insurance Co., USAA, Zurich American Insurance Co., Liberty Mutual Insurance Co., Progressive Casualty Insurance Co., the American Insurance Ass'n, the National Ass'n of Mutual Insurance Cos., the Property Casualty Insurers Ass'n of America, the Ass'n of Corpo-

rate Counsel, the Insurance Council of Texas, the Texas Ass'n of Business, and attorney Julia F. Pendery. The State Bar of Texas has submitted a brief that does not take sides but urges the Court to grant the Committee's petition and give guidance on the issues.

38. *See In re Nolo Press/Folk Law, Inc.,* 991 S.W.2d 768, 777–778 (Tex.1999) (holding that arguments that the records of the Unauthorized Practice of Law Committee should not be confidential raised administrative issues to be resolved by the Supreme Court); *State Bar of Tex. v. Gomez,* 891 S.W.2d 243, 245–246 (Tex.1994) (holding that whether attorneys should be required to provide pro bono legal services was an administrative matter).

## II

### A

■ We start from a point of agreement among the parties, that a corporation is not authorized to engage in the practice of law. As we have previously stated:

The Supreme Court of Texas has inherent power to regulate the practice of law in Texas for the benefit and protection of the justice system and the people as a whole. The Court's inherent power is derived in part from Article II, Section 1 of the Texas Constitution, which divides State governmental power among three departments. The authority conveyed to the Supreme Court by this constitutional provision includes the regulation of judicial affairs and the direction of the administration of justice in the judicial department. Within this authority is the power to govern the practice of law. The Court's inherent power

under Article II, Section I to regulate Texas law practice is assisted by statute, primarily the State Bar Act [Texas Government Code chapter 81].[39]

The Legislature has acknowledged that the Court has exclusive authority to adopt rules governing admission to the practice of law in Texas.[40] Those rules permit only individuals meeting specified qualifications to practice law.[41] Entities, including insurance companies, are excluded.

The Committee relies on the more general provision of article 2.01(B)(2) of the Texas Business Corporation Act, which prohibits a corporation from transacting business in Texas "[i]f any one or more of its purposes ... is to engage in any activity which cannot lawfully be engaged in without first obtaining a license under the authority of the laws of this State ... and such a license cannot lawfully be granted to a corporation." [42] On the basis of this

**39.** *In re Nolo Press,* 991 S.W.2d at 769–770 (footnotes omitted).

**40.** *See* TEX. GOV'T CODE § 81.061 ("Rules governing the admission to the practice of law are within the exclusive jurisdiction of the supreme court."); *see also id.* § 82.021 ("Only the supreme court may issue licenses to practice law in this state as provided by this chapter. The power may not be delegated."). We note that in 2001, shortly after this case was filed in the trial court, two bills were introduced in the Texas House of Representatives to prohibit staff counsel from representing insureds. TEX. H.B. 1383, 77th Leg., R.S. (2001); TEX. H.B. 3563, 77th Leg., R.S. (2001). The former bill was reported out of committee and sent to be calendared, without further action; the other was considered in committee but not reported out.

**41.** TEX.R. GOVERN. BAR ADM'N I–XXI. *See also* TEX. GOV'T CODE § 81.102("(a) Except as provided by Subsection (b), a person may not practice law in this state unless the person is a member of the state bar. (b) The supreme court may promulgate rules prescribing the procedure for limited practice of law by: (1) attorneys licensed in another jurisdiction; (2) bona fide law students; and (3) unlicensed

graduate students who are attending or have attended a law school approved by the supreme court.").

**42.** TEX. BUS. CORP. ACT art 2.01(B)(2). The Act applies to insurance companies to the extent it is not inconsistent with the Texas Insurance Code. *Id.* arts. 2.01(B)(4)(d) ("No corporation may adopt this Act or be organized under this Act or obtain authority to transact business in this State under this Act: ... [i]f any one or more of its purposes is to operate any of the following: ... insurance companies of every type and character that operate under the insurance laws of this State"), 9.14(A) ("This Act does not apply to domestic corporations organized under any statute other than this Act ...; provided, however, that if any domestic corporation was heretofore or is hereafter organized under or is governed by a statute other than this Act ... that contains no provisions in regard to some of the matters provided for in this Act, ... or if such a statute specifically provides that the general laws for incorporation or for the granting of a certificate of authority to transact business in this State, as the case may be, shall supplement the provisions of such statute, then the provisions of this Act shall apply to the extent

provision, the court of appeals rejected the Committee's argument, stating that "[t]he short answer is that an insurance company is not organized to practice law."[43] But article 2.01(B)(2) applies whenever "*any one*" of a corporation's purposes is to engage in a licensed activity. The court of appeals characterized an insurer's defense of an insured as "collateral" to the purpose of indemnification,[44] but that understates the importance to insureds of a defense against claims. Defense and indemnification are both important provisions of liability insurance, and it would be hard to say that one was collateral to the other. In any event, we need not construe article 2.01(B)(2)'s broad limitation on engaging in all licensed activities when our rules governing admission to practice law are sufficient to exclude insurance companies from engaging in *that* activity.

## B

The parties also agree that a company does not engage in the practice of law by employing attorneys on its salaried staff to represent its own interests. This has long been settled law. In 1933, the Legislature enacted Article 430a of the Texas Penal Code, which made it "unlawful for any corporation or any person, firm,

or association of persons, except natural persons who are members of the bar regularly admitted and licensed, to practice law."[45] The statute defined the practice of law broadly but specified that it was not to be "construed to prohibit any person, firm, association or corporation, out of court, from attending to and caring for his or its own business".[46] As for attending to business *in* court, a corporation was prohibited only from "appear[ing] as an attorney for any person *other than itself* in any court in this State, or before any judicial body or any board or commission of the State of Texas".[47] Thus, Article 430a recognized that a corporation was not practicing law by using house counsel to provide legal advice regarding the corporation's own affairs or to appear in court on its behalf. Article 430a was repealed in 1949, but only because the Legislature recognized that "under the Constitution, the judicial department of the State government has power to define the practice of law and by civil proceedings protect the public from its practice by laymen and corporations." Therefore, the Legislature concluded, the statute had "no practical value for the suppression of the unauthorized practice of law".[48] The repeal had no effect on the use of house counsel.

that they are not inconsistent with the provisions of such other statute...."); Tex. Ins. Code §§ 841.002, 841.003 (stating that for life, health, and accident insurers, "An insurance company incorporated in this state is subject to the Texas Business Corporation Act ... to the extent [it is] not inconsistent with this chapter or another law described by Section 841.002."), 822.002 (same for other insurers).

43. 121 S.W.3d 831, 839 (Tex.App.-Eastland 2003).

44. *Id.*

45. Act of May 31, 1933, 43d Leg., R.S., ch. 238, § 1, 1933 Tex. Gen. Laws 835, 835–838,

*repealed by* Act of May 19, 1949, 51st Leg., R.S., ch. 301, § 1, 1949 Tex. Gen. Laws 548.

46. *Id.* § 2.

47. *Id.* § 3 (emphasis added).

48. Act of May 19, 1949, 51st Leg., R.S., ch. 301, §§ 1, 2, 1949 Tex. Gen. Laws 548. *See also* Tex. Gov't Code § 81.101(b) ("The definition [of the 'practice of law'] in this section is not exclusive and does not deprive the judicial branch of the power and authority under both this chapter [81 of the Texas Government Code] and the adjudicated cases to determine whether other services and acts not enumerated may constitute the practice of law.").

■ Ethics opinions and rules do not determine what constitutes the practice of law, but they do reflect the state of the practice as it exists. In 1958, the State Bar of Texas Committee on Interpretation of the Canons of Ethics issued a formal opinion that "companies have the right to employ attorneys on a salarybasis" to perform legal services for their employers.[49] The six-sentence, unanimous opinion treated the issue as too plain to require analysis. Currently, Rule 1.12(a) of the Texas Disciplinary Rules of Professional Conduct recognizes that an organization may be represented by a lawyer it "employed".[50] Comment 5 to Rule 1.12(a) adds that "[a] lawyer representing an organization may, of course, also represent any of its directors, officers, employees, members, shareholders, or other constituents" as long as there is no conflict of interest that precludes such representation.[51] The comment assumes that the representation is "dual"—that is, the lawyer is representing the corporation and individual as part of the same matter. Another formal opinion of the Committee on Interpretation of the Canons of Ethics concluded in 1968 that a lawyer employed by a corporation does not aid in the unauthorized practice of law by representing the corporation's parent or subsidiary because "[t]here is obviously a common interest and there is for all practical purposes only one client involved."[52] As these opinions and rules recognize, a corporation does not engage in practicing law by employing an attorney to represent itself, together with the common interests of other employees and affiliates.

Nor does anyone suggest in this case that an insurer is practicing law when it retains a private attorney to provide its insured the defense required by the policy, even though the policy gives the insurer absolute control of the defense. Article 430a specifically excluded insurance defense from its prohibition of the corporate practice of law, stating:

> nothing herein shall prohibit any insurance company from causing to be defended, or prosecuted, or from offering to cause to be defended, through lawyers of its own selection, the insureds or assureds in policies issued or to be issued by it, in accordance with the terms of such policies.... [53]

■ Thirty years after repealing Article 430a, the Legislature again undertook to define the practice of law in amendments to the State Bar Act.[54] Recodified as Section 81.101(a) of the Texas Government Code, that definition is now as follows:

> In this chapter the "practice of law" means the preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding on behalf of a client before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use

---

**49.** Comm. on Interpretation of the Canons of Ethics, State Bar of Tex., Op. 167 (1958).

**50.** TEX. DISCIPLINARY R. PROF'L CONDUCT 1.12 ("A lawyer employed or retained by an organization represents the entity.").

**51.** *Id.* cmt 5.

**52.** Comm. on Interpretation of the Canons of Ethics, State Bar of Tex., Op. 343 (1968).

**53.** Act of May 31, 1933, 43d Leg., R.S., ch. 238, § 1, 1933 Tex. Gen. Laws 835, 835–838, *repealed by* Act of May 19, 1949, 51st Leg., R.S., ch. 301, § 1, 1949 Tex. Gen. Laws 548.

**54.** Act of May 28, 1979, 66th Leg., R.S., ch. 510, § 1, 1979 Tex. Gen. Laws 1081, 1090–1091, *codified at* TEX.REV.CIV. STAT. ANN. art. 320a–1, § 19(a) (Vernon 1979), *recodified by* Act of April 30, 1987, 70th Leg., R.S., ch. 148, § 3.01, 1987 Tex. Gen. Laws 534, 604, *at* TEX. GOV'T CODE § 81.101(a).

of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined.

Nothing in the legislative history of the amendments indicates that the Legislature intended any change in the general understanding of the practice of law. Implicit in the definition is that the practice of law requires the rendering of legal services *for someone else.* Section 81.101(a) does not outlaw house counsel in Texas. This section does not mean that a corporation engages in the practice of law when its attorney-employees provide legal advice regarding the corporation's own affairs or represent others with identical interests in court. Only when a corporation employs attorneys to represent the unrelated interests of others does it engage in the practice of law.

### C

The issue, then, is whether an insurer that uses staff attorneys to defend claims against insureds is practicing law or simply defending its own interests in discharging its contractual duty to the insureds and defeating claims it would be required to indemnify. We are aware that state regulation of the unauthorized practice of law may be limited by the First Amendment, such as when an organization furnishes legal services to advance the personal interests of its members through a staff attorney,[55] but American Home and Travelers make no constitutional argument in this case. They argue only that they are not practicing law.

American Home and Travelers point to our 1940 decision in *Utilities Insurance Co. v. Montgomery,* where we said that an insurer obtaining a non-waiver agreement (what we now call a reservation of rights) from its insured "was seeking to protect its own interests rather than those of [its insured]", and thus "was not unlawfully practicing law" as prohibited by Article 430a, which was then in effect.[56] That was clearly correct because the insurer's interest in reserving coverage issues was distinct from, if not contrary to, any interest the insured had in the matter. But we did not speak to the insurer's interest in defending its insured. Also, nothing in our opinion suggests that the attorneys employed to defend the insured were on the insurer's staff rather than engaged in private practice. *Montgomery* does not aid the insurers.

But we think our opinion four years later in *Hexter Title & Abstract Co. v. Grievance Committee* does.[57] Hexter, an agent for a title insurance company, received applications for insurance and prepared abstracts of title. When its salaried employee-attorneys discovered defects in title, they would prepare an opinion describing the defects and instruments to correct them, which Hexter would then offer to the customer free of charge. Hexter advertised these services to attract customers who would purchase title abstracts and title insurance, but not all applicants who received the services actually bought insurance. Charged with engaging in the unauthorized practice of law in violation of Article 430a, which was still in

---

55. *See, e.g., United Mine Workers of Am. v. Ill. State Bar Ass'n,* 389 U.S. 217, 225, 88 S.Ct. 353, 19 L.Ed.2d 426 (1967) (holding that to prohibit, as an unauthorized practice of law, a union from using salaried lawyers to help members pursue workers' compensation claims violated the First Amendment).

56. 134 Tex. 640, 138 S.W.2d 1062, 1064 (1940).

57. 142 Tex. 506, 179 S.W.2d 946 (1944).

effect, Hexter argued that its preparation of title opinions and instruments of conveyance was in the furtherance of its own business. We rejected the argument, explaining:

> These transactions involve conveyances, releases, and mortgages from grantors to grantees, and to which the insurance company is not a party. They are executed for the purpose of placing good title in the grantee, so that the insurance company may thereafter insure the title if it chooses. Such papers relate to the rights of third parties in which the corporation has no present interest, but only a prospective one. They affect the rights of individuals apart from their interest in the title insurance policy. The work of preparing these papers is distinct from the searching and insuring of the title-the legitimate business for which the corporation is incorporated. It is not the business of the title insurance company to create a good title in an applicant for insurance by preparing the necessary conveyances, nor to cure defects in an existing title by securing releases or prosecuting suits to remove clouds from title, merely for the purpose of putting the title in condition to be insured. The title insurance company must accept the title and insure it as it is, or reject it. It may examine the title, point out the defects, and specify the requirements necessary to meet its demands, but it is the business of the applicant for the insurance to cure the defects.[58]

If Hexter's rendition of legal services to customers and prospective customers was not the practice of law, then it was difficult to imagine what would be:

> If the defendant's contention that it has the right to prepare all legal documents necessary to create a good title in the applicant so that it may thereafter make a valid and safe contract to insure the title be sound, then a contractor, wholly unlearned in the law, could with equal propriety advertise that if a prospective purchaser of real property would give him a contract to construct a building thereon, he would examine the abstract of title to the land for the prospective purchaser and draw all papers necessary to put good title in such purchaser. The contractor could argue that in doing so he was only transacting his own business, because it was necessary for the purchaser to have good title to the property in order to enable the contractor to take a valid lien thereon to secure his cost. A fire insurance agent could advertise that if a prospective purchaser of real property would agree to insure the buildings on the premises through his agency he would examine the title and prepare all papers necessary to make the purchaser the owner thereof. Loan companies and banks could make similar propositions on condition that they be permitted to place a loan on the property. Corporations engaged in buying municipal bonds could propose to prepare the bond record and supervise the election for the issuance of the bonds and perform all other necessary legal services, if the municipality would promise to sell the bonds to such corporation. These examples could be multiplied indefinitely. Ultimately most legal work, other than the trial of cases in the courthouse, would be performed by corporations and others not licensed to practice law. The law practice would be hawked about as a leader or premium to be given as an inducement for business transactions.[59]

---

58. *Id.* at 952.

59. *Id.* at 953.

We concluded that Hexter was engaged in the unauthorized practice of law. We emphasized that Hexter was permitted to employ salaried attorneys to advise it on the state of title for its own uses; it was prohibited only from providing the same service to customers and prospective customers for their use:

> Most assuredly the insurance company may examine for its own benefit the abstract of title to property which it proposes to insure, to determine whether or not it will insure the title, and it may specify the corrections necessary to meet its demands. But it may not furnish a title opinion to a prospective purchaser to be used by him in determining whether or not he will buy the property, neither may it hold itself out as being authorized to do so.[60]

■ From our analysis in *Hexter*, we distill three factors to be considered in determining whether a corporation engages in the practice of law by employing staff attorneys to provide legal services to someone other than the corporation, and more particularly, whether a liability insurer is practicing law by using staff attorneys to defend claims against insureds. One factor is whether the company's interest being served by the rendition of legal services is existing or only prospective. Hexter rendered services free of charge to attract business and to help applicants for title insurance cure title defects before insurance was purchased. A liability insurer, on the other hand, renders legal services to an insured to satisfy its contractual obligation to provide the insured a defense. While there is evidence that insurers advertise their use of staff attorneys and resulting lower premiums to attract business, legal services are not rendered to attract business but to satisfy a contractual obligation.

■ But a company does not avoid engaging in the unauthorized practice of law merely because it provides legal services out of contractual obligation. A second factor is whether the company has a direct, substantial financial interest in the matter for which it provides legal services. Hexter's interest in providing legal services to customers and prospective customers was to attract business; it had no other interest in their affairs. Hexter was entitled to legal advice concerning the state of titles for purposes of issuing abstracts and insurance, and it was entitled to employ attorneys to provide that advice, but its business interests were distinct and different from those of its customers. A liability insurer's interest in avoiding its indemnity obligation gives it a direct, financial, and substantial interest in defending a claim against its insured. If the claim is defeated, the insurer benefits. For Hexter, the principal benefit in correcting defects in a potential customer's title was a potential sale.

■ Most important, however, is a third factor: whether the company's interest is aligned with that of the person to whom the company is providing legal services. When the company and its employee or affiliate have common interests, a staff attorney can represent them both because, to quote the 1968 ethics opinion, "there is for all practical purposes only one client involved."[61] Hexter sold services, and its customers bought them. The interests of each were their own. But in the vast majority of cases, a liability insurer and an insured have the same interest in defeating a liability claim, and their interests differ only when there are coverage

---

60. *Id.* at 954.

61. Comm. on Interpretation of the Canons of Ethics, State Bar of Tex., Op. 343 (1968).

questions or when the consequences of the manner in which the defense is rendered affect them differently.

 Applying these factors, we conclude that a liability insurer does not engage in the practice of law by providing staff attorneys to defend claims against insureds, provided that the insurer's interests and the insured's interests in the defense in the particular case at bar are congruent. In such cases, a staff attorney's representation of the insured and insurer is indistinguishable.

### D

It is certainly not unusual for an insured and an insurer to differ over the coverage of a claim or an aspect of the defense so that a single lawyer cannot represent them both, but the Committee and amici argue that the insured-insurer relationship is so fraught with the potential for conflict that an insurer that uses staff attorneys to defend insureds is essentially practicing law. To be sure, conflicts can also arise, and do, when the insured's lawyer is not the insurer's employee, but the Committee and amici argue that the employment relationship between an insurer and its staff attorney increases and exacerbates these conflicts. For private counsel, they argue, an insurer is but a source of business, whereas for a staff attorney, the insurer controls pay, benefits, and retention. The pressures and loyalties of the employment relationship, they continue, make it more difficult for an attorney to provide an insured the independent judgment and professional relationship, to which the insured is entitled. The insurer's profit motive, the Committee and amici assert, is fundamentally inconsistent with the provision of independent legal services through staff attorneys. Even if staff attorneys can sometimes represent insureds, the argument concludes, their use further erodes the practice of law into a business, and such obvious control of insurers over legal services undermines public confidence in the bar.

These arguments raise serious concerns, especially coming from the Committee charged by this Court and the Legislature with protecting the public from the unauthorized practice of law, and we examine them carefully. As we do, however, we note that neither the Committee nor amici has been able to cite any empirical evidence—any actual instance—of injury to a private or public interest caused by a staff attorney's representation of an insured. The court of appeals also noted this lack of evidence,[62] as have amici[63] and at least one prominent commentator.[64] Given that insurers have used staff attorneys across the country for decades, the lack of evidence of harm is an important consideration. There is no question, of course, that conflicts arise in the tripartite insurer—insured—defense attorney relationship, but

**62.** 121 S.W.3d 831, 833 (Tex.App.-Eastland 2003) ("The UPLC also concedes that 'there is no evidence in the record regarding complaints by insureds' despite the long period during which insurance companies have used staff counsel.").

**63.** Brief of Amicus Curiae American Insurance Ass'n, National Ass'n of Mutual Insurance Cos., Property Casualty Insurers Ass'n of America, Ass'n of Corporate Counsel, Insurance Council of Texas, and Texas Ass'n of Business at 6; Brief of Amicus Curiae Allstate Insurance Co., USAA, Zurich American Insurance Co., Liberty Mutual Insurance Co., Progressive Casualty Insurance Co. at 24.

**64.** Charles Silver, *When Should Government Regulate Lawyer-client Relationships? The Campaign to Prevent Insurers from Managing Defense Costs*, 44 Ariz. L.Rev. 787, 799 (2002) ("A review of the many reports, cases, advisory opinions, and law review articles produced in recent years uncovered no documented evidence of harm to policyholders.").

there is nothing to indicate that staff attorneys do not either resolve them as they would be resolved in any other representation or withdraw, just as private attorneys would.[65]

The most common conflict between an insurer and an insured is whether a claim is within policy limits and the coverage provided. Often coverage cannot be determined when a claim is first filed. Texas procedure does not permit a plaintiff claiming unliquidated damages, such as for physical pain and mental anguish, to state a dollar figure in his petition.[66] Even after the basis for the claim is explored in discovery, it may be difficult to quantify the amount of damages and determine whether they fall within policy limits. Other coverage issues may also depend on facts developed in the litigation. When an insurer is concerned that there may be a coverage issue, it usually issues a reservation-of-rights letter when it accepts the defense, agreeing to defend the insured without waiving its right to decline coverage later. Sometimes, according to the brief record before us, letters are issued liberally, as a prophylactic measure, without any specific intent to pursue a coverage issue. A reservation-of-rights letter ordinarily does not, by itself, create a conflict between the insured and the insurer; it only recognizes the possibility that such

a conflict may arise in the future. Our record reflects that staff attorneys for the insurers in this case usually do not represent insureds when the insurer's adjuster has identified a serious coverage issue, but sometimes do when a reservation-of-rights letter has issued merely as a matter of routine. Declining representation is the safer course [67] to avoid conflicts that destroy the congruence of interest between the insurer and the insured that allows for the use of staff attorneys. However, we cannot say as a blanket rule that a staff attorney can never represent an insured under a routine reservation of rights.

It is not unusual for defense counsel to acquire information that the insured could expect to be kept confidential and not disclosed to the insurer. The information may relate to coverage, to underwriting issues such as whether a policy should be cancelled or not renewed, or to other matters. Counsel's acquisition of such information may necessitate withdrawal from the representation whether the attorney is on staff or in private practice.[68] But Texas law imputes knowledge of confidential information to counsel's lawyer-associates so that in a private law firm, all of the lawyers are irrebuttably presumed to have knowledge of the confidential information.[69] The presumption does not apply

65. *See generally* Tex. Disciplinary R. Prof'l Conduct 1.06 (relating to conflicts of interest).

66. Tex.R. Civ. P. 47 ("An original pleading which sets forth a claim for relief, whether an original petition, counterclaim, cross-claim, or third party claim, shall contain ... (b) in all claims for unliquidated damages only the statement that the damages sought are within the jurisdictional limits of the court.").

67. *See* Brief of Amicus Curiae Allstate Insurance Co., USAA, Zurich American Insurance Co., Liberty Mutual Insurance Co., Progressive Casualty Insurance Co. at 44–45 ("[M]any insurers avoid this practice and always let outside counsel take the risk when

providing a defense subject to a reservation of rights. Travelers and American Home use outside counsel whenever the coverage issue could be affected by the defense or outcome of the litigation.").

68. *See generally* Tex Disciplinary R. Prof'l Conduct 1.05 (providing for attorney-client confidentiality).

69. *Tesco Am., Inc. v. Strong Indus. Inc.*, 221 S.W.3d 550, 553 (Tex.2006) ("Texas law imputes one attorney's knowledge to all attorneys in a firm." (citing *National Med. Enter., Inc. v. Godbey*, 924 S.W.2d 123, 131 (Tex. 1996))).

the same way to non-lawyers in the firm.[70] It is not clear whether confidential information acquired by staff attorneys would be imputed to non-attorneys outside the corporation's legal department, such as management, or if it were, whether the imputation would provide a basis for estopping the insurer from asserting an issue to which the information pertained, such as coverage. It could be argued that a staff attorney's knowledge of confidential information would estop the insurer from using it altogether.[71] While these problems present risks to the insurer in using staff counsel, they do not necessarily destroy the congruence of the insurer's and insured's interest.

▇▇▇ An insurer has a so-called *Stowers* duty to accept a claimant's reasonable offer to settle within policy limits or stand to an excess judgment.[72] The Committee argues that sometimes staff attorneys are restricted by their employer in whether they may apprise an insured of the insurer's *Stowers* obligation and are sometimes required to obtain management approval before making or responding to settlement offers that implicate that duty. The Committee argues that a staff attorney cannot be expected to disregard the insurer's policies on such matters, even when it would be in the insured's best interest to do so, because of fear of reprisal in employment. But a private defense attorney who fails to follow the insurer's instructions may also fear reprisal—in loss of business and consequent pressure from partners and the law firm. As we have noted, defense counsel, whether private or on staff, owes the insured unqualified loyalty.[73] It is possible that counsel will fail to render that loyalty, but we cannot presume that a staff attorney is more likely to do so, especially absent any evidence of a complaint ever having been made.

The Committee argues that staff attorneys are subject to other litigation guidelines requiring approval to conduct investigations, hire expert witnesses, and take other actions in defense of claims. The Committee acknowledges that private attorneys are often subject to the same kinds of restrictions, but it argues that private counsel are more independent and less likely to adhere to guidelines that compromise the insured's interests. There is evidence in the record, however, that American Home and Travelers do not restrict staff attorneys in exercising independent judgment. Rule 5.04(c) of the Texas Disciplinary Rules of Professional Conduct prohibits a lawyer from "permit[ting] a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services."[74] Again, we cannot presume that staff attorneys are more likely to act unethically in this respect with no evidence of complaints that they have done so.

One amicus argues that an insured may have personal concerns that a staff attorney cannot protect, such as a concern about the effect of a claim or defense on the insured's reputation, or family de-

---

**70.** *In re American Home Prods., Inc.,* 985 S.W.2d 68, 74-75 (Tex.1998) (orig.proceeding); *Phoenix Founders, Inc. v. Marshall,* 887 S.W.2d 831, 834–836 (Tex.1994) (orig.proceeding).

**71.** *Cf. In re George,* 28 S.W.3d 511 (Tex.2000) (orig.proceeding).

**72.** *G.A. Stowers Furniture Co. v. Am. Indem. Co.,* 15 S.W.2d 544, 547 (Tex. Comm'n App. 1929, holding approved).

**73.** *See supra* notes 4 and 5, and accompanying text.

**74.** TEX. DISCIPLINARY R. PROF'L CONDUCT 5.04(C).

mands. These may occur, but we see no reason why a staff attorney would necessarily be less respectful of them than private counsel.

The Committee argues that under Texas law insurance defense counsel represents only the insured, not the insurer, and that staff attorneys—who necessarily represent the insurer—cannot defend insureds without violating this rule. But we have never held that an insurance defense lawyer *cannot* represent both the insurer and the insured, only that the lawyer *must* represent the insured and protect his interests from compromise by the insurer.[75] And we have noted that "an insurer's right of control generally includes the authority to make defense decisions *as if it were the client* 'where no conflict of interest exists.'"[76] Rule 1.06 of the Texas Disciplinary Rules of Professional Conduct allows a lawyer to represent more than one client in a matter if not precluded by conflicts between them.[77] Whether defense counsel

also represents the insurer is a matter of contract between them.[78]

In sum, the Committee argues that while an insurer's control of defense counsel always impinges on counsel's professional judgment and loyalty to the insured, the ethical problems are greater in number and magnitude when the defense is conducted by a staff attorney who owes the insurer allegiance as both a client and boss. These problems, the Committee argues, even though they may sometimes be resolved satisfactorily, should be avoided altogether. We do not minimize these difficulties or criticize the Committee for raising them by means of this proceeding. And we are especially concerned that the use of staff attorneys not diminish professionalism in insurance defense or harm the public. The use of staff attorneys comes with risks, as American Home and Travelers themselves acknowledge. If an insurer's interest conflicts with an insured's,[79] or the insurer acquires confidential infor-

---

**75.** *State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625, 628 (Tex.1998) ("[B]ecause the lawyer owes unqualified loyalty to the insured, the lawyer must at all times protect the interests of the insured if those interests would be compromised by the insurer's instructions." (citation omitted)); *American Physicians Ins. Exch. v. Garcia*, 876 S.W.2d 842, 844 n. 6 (Tex.1994) (noting that defense counsel in that case represented the insured and not the insurer); *Employers Cas. Co. v. Tilley*, 496 S.W.2d 552, 558 (Tex.1973) ("[An insurance defense] attorney becomes the attorney of record and the legal representative of the insured, and as such he owes the insured the same type of unqualified loyalty as if he had been originally employed by the insured. If a conflict arises between the interests of the insurer and the insured, the attorney owes a duty to the insured to immediately advise him of the conflict.").

**76.** *Northern County Mut. Ins. Co. v. Davalos*, 140 S.W.3d 685, 688 (Tex.2004) (emphasis added) (citing *Traver*, 980 S.W.2d at 627).

**77.** *See also* RESTATEMENT (THIRD) OF THE LAW GOVERNING LAWYERS § 134 (2000) ("(1) A law-

yer may not represent a client if someone other than the client will wholly or partly compensate the lawyer for the representation, unless the client consents under the limitations and conditions provided in § 122 and knows of the circumstances and conditions of the payment. (2) A lawyer's professional conduct on behalf of a client may be directed by someone other than the client if: (a) the direction does not interfere with the lawyer's independence of professional judgment; (b) the direction is reasonable in scope and character, such as by reflecting obligations borne by the person directing the lawyer; and (c) the client consents to the direction under the limitations and conditions provided in § 122.").

**78.** *See* Charles Silver, *Does Insurance Defense Counsel Represent the Company or the Insured?*, 72 TEX. L.REV. 1583, 1603–1604 (1994).

**79.** *Davalos*, 140 S.W.3d at 689 (stating that certain serious conflicts of interest with an insured may prevent an insurer from insisting on its contractual right to control the defense, but noting that "[e]very disagreement about

mation that it cannot be permitted to use against the insured, or an insurer attempts to compromise a staff attorney's independent, professional judgment, or in some other way the insurer's and insured's interests do not have the congruence they have in the many cases in which they are united in simple opposition to the claim, then the insurer cannot use a staff attorney to defend the claim without engaging in the practice of law. But there are a great many cases that can be defended by staff attorneys without conflict and to the benefit of mutual interests. The use of staff attorneys in those cases does not constitute the unauthorized practice of law.

## E

Finally, we note that insurers' use of staff attorneys to defend claims against insureds has been approved in several other states.[80] The supreme courts of Georgia, Indiana, Missouri, and Tennessee,[81] and lower courts in five other states,[82] have held that insurers' use of staff attorneys does not constitute the unauthorized practice of law. The Florida Supreme Court has reached essentially the same conclusion by approving ethical rules that allow the practice provided the staff attorney determines and discloses whether he or she represents only the insured or the insurer as well.[83] Three states—Illinois, Maryland, and Minnesota—have statutes that would, either expressly or as applied, except insurance companies and their use of staff counsel from that state's prohibition of the unauthorized practice of law.[84] Ethics committees in eight states have is-

---

how the defense should be conducted cannot amount to a conflict of interest [or] the insured ... could control the defense by merely disagreeing with the insurer's proposed actions").

**80.** *See generally* Michelle Brown Cashman, Annotation, *Propriety of Insurers' Use of Staff Attorneys to Represent Insureds*, 2 A.L.R. 6th 537, 545–550 (2005).

**81.** *Coscia v. Cunningham*, 250 Ga. 521, 299 S.E.2d 880, 882–883 (1983); *Cincinnati Ins. Co. v. Wills*, 717 N.E.2d 151, 163 (Ind.1999); *In re Allstate Ins. Co.*, 722 S.W.2d 947, 951 (Mo.1987); *In re Youngblood*, 895 S.W.2d 322, 331 (Tenn.1995).

**82.** *Gafcon, Inc. v. Ponsor & Assocs.*, 98 Cal. App.4th 1388, 120 Cal.Rptr.2d 392, 404 (2002); *Kittay v. Allstate Ins. Co.*, 78 Ill. App.3d 335, 33 Ill.Dec. 867, 397 N.E.2d 200, 202 (1979); *King v. Guiliani*, No. CV 92–0290370–S, 1993 Conn.Super. LEXIS 1889, at *6–28, 1993 WL 284462, at *2–9 (Conn.Super.Ct. July 27, 1993) (mem.); *Strother v. Ohio Cas. Ins. Co.*, 5 Ohio Supp. 362, 14 Ohio Op. 139 (Ohio Com.Pl.1939); *Schoffstall v. Nationwide Mut. Ins. Co.*, 58 Pa. D. & C.4th 14, 36, 2002 Pa. Dist. & Cnty. Dec. LEXIS 196, at *28–29, 2002 WL 31951309 (Pa.Com. Pl.2002), *aff'd* 844 A.2d 1297 (Pa.Super.Ct.2003) (unpublished table decision), *pet.*

*denied* 578 Pa. 695, 851 A.2d 142 (2004) (unpublished decision per curiam).

**83.** *In re Amendment to Rules Regulating the Fla. Bar re Rules of Prof'l Conduct*, 838 So.2d 1140, 1141–1142 (Fla.2003); *see also In re Rules Governing the Conduct of Attorneys in Fla.*, 220 So.2d 6, 7, 9 (Fla.1969) (refusing to approve an ethics rule that would have prohibited an employee-attorney from representing anyone other than the employer "unless it shall clearly appear that the sole financial interest and risk involved is that of the lay agency").

**84.** 705 Ill. Comp. Stat. 220/5 (West 2007) ("Nothing contained in [the Corporation Practice of Law Prohibition Act] shall prohibit ... any litigation in which any corporation may be interested by reason of the issuance of any policy or undertaking of insurance"); Md. Code Ann., Bus. Occ. & Prof. § 10–206(b)(3) (Lexis Nexis 2007) (requiring admission to the bar to practice law except for "an insurance company while defending an insured through staff counsel"); Minn.Stat. Ann. § 481.02, subd. 3(3) (West 2008) (prohibiting the unauthorized practice of law but not "any insurance company from causing to be defended, or from offering to cause to be defended through lawyers of its selection, the insureds in policies issued or to be issued by it, in accordance with the terms of the policies").

sued opinions that insurers' use of staff attorneys does not constitute the unauthorized practice of law,[85] and committees in three other states have held that it is not unethical for staff attorneys to represent insureds.[86] Only the supreme courts of Kentucky and North Carolina, approving ethics opinions in their respective states, have concluded that insurers' use of staff attorneys to defend insureds is prohibited as the corporate practice of law.[87]

## III

■■■ The Committee also argues that the use of staff attorneys is prohibited by section 38.123 of the Texas Penal Code. That section, entitled "Unauthorized Practice of Law," states in paragraph (a):

A person commits an offense if, with intent to obtain an economic benefit for himself or herself, the person:

(1) contracts with any person to represent that person with regard to personal causes of action for property damages or personal injury;

(2) advises any person as to the person's rights and the advisability of making claims for personal injuries or property damages;

(3) advises any person as to whether or not to accept an offered sum of money in settlement of claims for personal injuries or property damages;

(4) enters into any contract with another person to represent that person in personal injury or property damage matters on a contingent fee basis with an attempted assignment of a portion of the person's cause of action; or

(5) enters into any contract with a third person which purports to grant the exclusive right to select and retain legal counsel to represent the individual in any legal proceeding.[88]

By "person" the statute means "an individ-

**85.** Alabama Office of Gen. Counsel, Ethics Op. RO–2007–01 (2007), http://www.alabar.org/ogc/PDF/2007–01.pdf; Alaska Bar Ass'n Ethics Comm., Op. 99–3 (1999), http://www.alaskabar.org/index.cfm?ID=4880; State Bar of California Standing Comm. on Prof'l Responsibility and Conduct, Formal Op.1987–91 (1987), http://calbar.ca.gov/calbar/html_unclassified/ca87–91.html; Colorado Bar Ass'n, Formal Ethics Op. 91 (1993), http://www.cobar.org/index.c fm/ID/386/subID/1812/CETH/Ethics–Opinion–91:Ethical–Duties–of–Attorney–S elected–by–Insurer–to–Represent–Insured,–01/16/93/; Illinois State Bar Ass'n, Advisory Op. on Prof'l Conduct 89–17 (1990), 1990 WL 709688; Iowa Sup.Ct. Bd. of Prof'l Ethics and Conduct, Op. 88–14 (1989), http://www.iowabar.org/ethics.nsf/e61beed77a215f6686256497004ce492/370793439078ef48862564c30054b529!OpenDocument; Michigan Bar Comm. on Prof'l & Judicial Ethics, Op. CI–1146 (1986), http://www.michbar.org/opini ons/ethics/numbered_opinions/ci–1146.html?CFID= 273276 & CFTOKEN=45526763; New Jersey Sup. Ct. Comm. on Unauthorized Practice, Op. 23 (1996), htt p://lawlibrary.rutgers.edu/eth-

ics/cuap/cua23_2.html; Wisconsin State Bar Comm. on Prof'l Ethics, Formal Op. E–95–2 (1998), http://www.wisbar.org/AM/Template.cfm?Section=Search & section=Formal_Opinion & template=/cm/contentdisplay.cfm & contentfileid=6344.

**86.** New York Bar Ass'n Prof'l Ethics Comm., Op. 109 (1969), http://www.nysba.org/AM/Template.cfm?Section=Ethics_Opinions & TEMPLATE=/CM/ContentDisplay.cfm & CONTENTID=13494; Oklahoma Bar Ass'n, Ethics Op. 309 (1998), http://www.okbar.org/ethics/309.htm; Pennsylvania Bar Ass'n Comm. on Legal Ethics and Prof'l Responsibility, Formal Op. 96–106 (1997), 1997 WL 188817.

**87.** *American Ins. Ass'n v. Ky. Bar Ass'n*, 917 S.W.2d 568, 569, 574 (Ky.1996) (approving Kentucky Bar Ass'n, Unauthorized Practice of Law Op. U–36 (1981)); *Gardner v. N.C. State Bar*, 316 N.C. 285, 341 S.E.2d 517, 518 (1986) (approving North Carolina State Bar, Ethics Op. CPR 326 (1983)).

**88.** Tex. Penal Code § 38.123(a).

ual, corporation, or association".[89] The provision does not apply to lawyers.[90] A first offense is a Class A misdemeanor; a subsequent offense is a third degree felony.[91]

The court of appeals observed that a literal reading of this statute would prohibit liability insurers not only from using staff attorneys to defend insureds but from using private attorneys as well, a result the court called absurd.[92] But the statute does not go quite so far. It does not prohibit an insurer from contracting with private counsel to represent an insured. Paragraph (a) could be read to prohibit a staff attorney from agreeing to represent an insured if the agreement were really between the staff attorney's employer, the insurer, and the insured. One might argue that the agreement in that situation was between the staff attorney and the insured, since only the attorney could provide legal representation, even though the insurer made the staff attorney available.

But we need not struggle over the exact meaning of paragraph (a) because we do not think that section 38.123 was intended to address liability insurers' defense of their insureds. That is clear from paragraph (a)(5), which prohibits any contract that grants one party the exclusive right to select and retain legal counsel to represent the other. Since liability insurance policies commonly give that right to insurers, and have for many years, section 38.123 would make every insurer a felon. It "is simply too much to believe"[93] that the Legislature had that in mind when it enacted section 38.123, and we are quite sure that liability policy provisions giving insurers the right to control the defense have not changed since its enactment. What the Legislature had in mind when it enacted the statute in 1993 was stiffer prohibitions against barratry. That was the subject of the bill as enacted,[94] as well as a related bill,[95] and the publicly announced motivation of the sponsor and supporters, including the State Bar of Texas.[96] Insurance defense is not barratry.

## IV

Finally, the Committee argues that if staff attorneys are permitted to represent insureds, they must fully disclose their affiliation with insurers. American Home and Travelers do not oppose this requirement on principle but argue only that there is no evidence in the record that full disclosure is not being made. Rule 7.02 of the Texas Disciplinary Rules of Professional Conduct prohibits a lawyer from making any false or misleading representations about his or her services, and it goes without saying that a staff lawyer must fully disclose to a represented in-

89. *Id.* § 1.07(a)(38).

90. *Id.* § 38.123(b) ("This section does not apply to a person currently licensed to practice law in this state, another state, or a foreign country and in good standing with the State Bar of Texas and the state bar or licensing authority of any and all other states and foreign countries where licensed.").

91. *Id.* § 38.123(c)-(d).

92. 121 S.W.3d 831 843 (Tex.App.-Eastland 2003).

93. *Bridgestone/Firestone, Inc. v. Glyn–Jones,* 878 S.W.2d 132, 135 (Tex.1994) (Hecht, J.,

concurring) ("As the Court observes, that the Legislature would absolve seat belt manufacturers from products liability claims in a subsection of a traffic statute is simply too much to believe.").

94. Act of May 27, 1993, 73d Leg., R.S., ch. 723, 1993 Tex. Gen. Laws 2829 [S.B. 1227].

95. Tex. H.B. 2506, 73d Leg., R.S. (1993).

96. *See e.g.* Charles B. Camp, *State Bar Plans Crackdown on Ambulance–Chasers,* THE DALLAS MORNING NEWS, Mar. 20, 1993, at F1.

sured the identify of the lawyer's employer.

The Committee also argues that staff attorneys cannot use a name similar to a law firm, such as Woodruff & Associates, the name used at one time by American Home's staff attorneys. The Committee raised this issue in its motion for summary judgment, though not in its pleadings, and the trial court denied relief. The Committee did not appeal, and therefore the issue is not before us.

\* \* \* \* \*

American Home and Travelers may use staff attorneys to defend claims against insureds provided that the insurer's and insured's interests in the situation are congruent as described in this opinion, but staff attorneys must disclose their affiliation to their clients. The court of appeals' judgment is modified accordingly, and the remand for consideration of attorney fees is reversed. As modified, the judgment is

*Affirmed.*

Justice JOHNSON filed a dissenting opinion, in which Justice GREEN joined.

Justice JOHNSON, joined by Justice GREEN, dissenting.

Many matters addressed by briefs of the parties [1] and amici involve ethical and potential liability considerations of insurers and their staff counsel when staff counsel defend insureds. As the Court points out, those considerations do not determine what is or is not the unauthorized practice of law. The Court details several such issues, some easily-identified and some not-so-easily-identified, that are imbedded in the relationships when an insurer selects defense counsel for and controls the defense of its insured. Many, if not the majority, of the issues exist regardless of whether defense counsel is an employee of the insurer ("staff attorney" or "staff counsel") or independent counsel. Certainly the issues may be more complex when staff counsel represents an insured than when independent counsel does. Nevertheless, it seems to me that the issue before the Court narrows down to statutory construction: Is an insurance corporation's defense of its insureds by the use of staff attorneys the practice of law as defined in the State Bar Act. *See* TEX. GOV'T CODE § 81.101(a). The Court holds that under certain circumstances it is not. I disagree.

I agree that corporate insurance companies are not permitted to practice law in Texas. 261 S.W.3d at 34; *see* TEX. BUS. CORP. ACT art. 2.01(B)(2) (providing that a corporation may not be organized under the Act if any one of its purposes is to engage in an activity that requires a license and such a license cannot be granted to a corporation). Former Penal Code article 430a [2] specifically prohibited corporations from practicing law, but that article was repealed in 1949. There does not seem to have been a great deal of discussion about whether its repeal was a legislative signal that corporations were free to either practice law or defend insureds with staff attorneys. As the Court notes, the legislative record does not indicate that it was. *See* 261 S.W.3d at 36.

The Legislature specifically authorized the practice of law by entities other than natural persons over thirty-five years ago. Beginning in January 1970, certain types

---

1. Unauthorized Practice of Law Committee (UPLC), and American Home Assurance Co., and Travelers Indemnity Co. (collectively, "American Home").

2. Act of May 31, 1933, 43rd Leg., R.S., ch. 238, §§ 1–3, 1933 Tex. Gen. Laws 835–38, *repealed by* Act of May 19, 1949, 51st Leg., R.S., ch. 301, § 1, 1949 Tex. Gen. Laws 548.

of corporations were statutorily authorized to render professional legal services. Tex. Rev.Civ. Stat. art. 1528e § 3(d).[3] The corporate form was limited to professional legal corporations organized for the sole and specific purpose of rendering legal services. *See id.* "Professional Legal Services" were defined as

> any type of personal service rendered by attorneys-at-law which requires as a condition precedent to the rendering of such service within this state, the obtaining of a license, permit, certificate of registration, or other legal authorization and which prior to the passage of this Act and by reason of law could not be performed within this state by a corporation.

*Id.* at § 3(c). Insurance companies are not professional legal corporations. And because actual or beneficial ownership of professional legal corporations remains statutorily limited to licensed attorneys, insurance companies cannot own or operate Texas professional legal corporations. *See id.* If they could, the case now before the Court almost certainly would not be here. It is here because corporate insurers cannot be licensed to practice law, but they want the economic benefit of staff attorneys practicing law by defending insureds who are not corporate affiliates, subsidiaries, employees, officers, or agents. Seeking an economic benefit is not bad. In this instance, however, the benefit sought is not one that can be obtained by a corporation without running afoul of Texas' statutory definition of practicing law.

In *Hexter Title & Abstract Co. v. Grievance Committee*, 142 Tex. 506, 179 S.W.2d 946 (1944), this Court considered whether a corporation was practicing law when attorney employees of the corporation pre-

pared documents related to defects in title and offered them to third persons. Although the corporation had no connection with the transactions, the corporation hoped to issue policies of title insurance as a result of providing the documents. As background, the Court referenced the State Bar Act and two of its relevant purposes: "It will be noted that one of the purposes of the . . . act was to subject all members of the Bar to the provisions of the act, and another purpose was to prohibit those not members of the State Bar from practicing law." *Id.* at 948 (discussing Act of April 6, 1939, 46th Leg., R.S., ch. 1, §§ 2, 3, 1939 Tex. Gen. Laws 64–66, *repealed by* Act of April 30, 1987, 70th Leg., R.S., ch. 148, § 3.01, 1987 Tex. Gen. Laws 534, 593 (former Tex.Rev.Civ. Stat. 320a–1)). The Court then addressed the question of whether the corporation was practicing law "within the meaning of the Statutes of this State?" *Id.* at 949. The controlling statute was former Penal Code article 430a which we quoted in relevant part:

> Section 1. It shall be unlawful for any corporation or any person, firm, or association of persons, except natural persons who are members of the bar regularly admitted and licensed to practice law.

> Sec. 2. For the purpose of this Act, the practice of law is defined as follows: Whoever * * * (b) For a consideration, reward or pecuniary benefit, present or anticipated, direct, or indirect, advises or counsels another as to secular law, or draws a paper, document or instrument affecting or relating to secular rights; * * * or (d) For a consideration, direct or indirect, gives an opinion as to the validity of the title to real or personal prop-

---

**3.** Originally enacted as Act of May 28, 1969, 61st Leg., R.S., ch. 779, 1969 Tex. Gen. Laws 2304 (effective Jan. 1, 1970).

erty, \* \* \* is practicing law. Nothing in this section shall be construed to prohibit any person, firm, association or corporation, *out of court,* from attending to and caring for his or its own business, \* \* \* nor from preparing abstracts of title, certifying, guaranteeing or insuring titles to property, real or personal, or an interest therein, or a lien or encumbrance thereon, \* \* \*.

Sec. 3. It shall be unlawful for any corporation to practice law as defined by this Act or to appear as an attorney *for any person other than itself* in any court in this State, or before any judicial body or any board or commission of the State of Texas; or hold itself out to the public or advertise as being entitled to practice law; and no corporation shall prepare corporate charters or amendments thereto, or other legal documents not relating to its authorized business, or draw wills; or hold itself out in any manner directly or indirectly as being entitled to do any of the foregoing acts; \* \* \*.

*Id.* at 951 (emphasis added). We held that the title and abstract company was practicing law even if the documents were prepared by licensed attorneys and even if non-lawyer corporate executives did not direct how the documents were to be prepared:

> The fact that the corporation has several licensed lawyers in its employment to prepare the instruments in question does not alter the case. According to the agreed statement of facts the executive officers of the corporation direct the kind of instruments to be drawn and what should be put in them. But *even in the absence of such direction by the executives the result would be the same.*

The attorney in preparing such papers does so as the agent of the corporation by whom he is employed. His first obligation of loyalty is to the corporation. *His acts are the acts of the corporation, and even though the corporation acts through an attorney, it is nevertheless practicing law.*

*Id.* at 953–54 (emphasis added).

Fairly reading former article 430a, section 2 addressed out-of-court activities and section 3 addressed in-court activities. Section 3 specifically prohibited corporations from appearing "as an attorney for any person other than itself in any court in this State." *Id.* at 951. As the Court has noted, article 430a specifically provided that an insurer was not precluded from defending its insureds by lawyers of its own selection. *Id.* But what the statute did *not* say was that a corporation could, itself, defend its insureds in court.

More than twenty years after *Hexter* was decided, another case presented the issue of whether a nonprofit corporation was practicing law by using employee attorneys to represent indigents. *Touchy v. Houston Legal Found.,* 432 S.W.2d 690 (Tex.1968). Hugo A. Touchy, three other practicing attorneys, and an organization composed of attorneys (collectively, "Touchy") brought suit against the Houston Legal Foundation, a charitable corporation.[4] Touchy sought to enjoin the Foundation from engaging in (1) practices which allegedly violated the Texas Canons of Ethics, (2) the unauthorized practice of law, and (3) practices which were demeaning to the legal profession and economically harmful to the plaintiffs. *Id.* at 691. As to the unauthorized practice of law claim, Touchy asserted that the Foundation was

---

**4.** The Foundation's trustees were all licensed attorneys or judges who were members of the bar. *Touchy v. Houston Legal Found.,* 417

S.W.2d 625, 628 (Tex.Civ.App.-Waco 1967) *rev'd* 432 S.W.2d 690 (Tex.1968).

practicing law without authorization by directly representing clients by signing pleadings, motions, and other documents filed in court. *Id.* at 693.[5] The State Bar Act then provided that all persons licensed to practice law were members of the State Bar and all persons not members were " 'prohibited from practicing law in this State.' " *Id.* at 695 (quoting Act of April 6, 1939, 46th Leg., R. S., ch. 1, §§ 2, 3, 1939 Tex. Gen. Laws 64–66, *repealed by* Act of April 30, 1987, 70th Leg., R. S., ch. 148, § 3.01, 1987 Tex. Gen. Laws 534, 593 (former Tex.Rev.Civ. Stat. 320a–1)).

The Foundation responded by filing a plea in abatement challenging Touchy's standing to bring suit and a motion for summary judgment urging that Touchy did not have standing and that, as a matter of law, the Foundation was neither practicing law nor engaging in conduct demeaning to the profession. *Id.* at 691. The trial court granted both the plea in abatement and the motion for summary judgment, then dismissed the suit. *Id.* The court of appeals affirmed. *Id.* This Court held that by sustaining the plea in abatement, the trial court held that Touchy did not have standing to maintain the suit and could not have reached the merits. *Id.* at 693. The Court held that Touchy had standing, reversed the lower court judgments and remanded for further proceedings. In remanding, the Court set out the manner in which the unauthorized practice of law claim was to be tried:

The trial of the cause is to be governed by the following specific instructions: *The petitioners will have the burden of pleading and proving that the*

*Foundation is engaged in the unlawful practice of law by directly representing clients as an attorney, by signing pleadings in its name, or by appearing for such clients through its employees, in presenting pleadings, motions, orders and other documents filed in the several courts of this State.* Without pleadings and proof establishing that the activities of the Foundation constitute the practice of law, cases such as *San Antonio Bar Association v. Guardian Abstract & Title Co.*, 156 Tex. 7, 291 S.W.2d 697 (1956) and *Hexter Title & Abstract Co. v. Grievance Committee*, 142 Tex. 506, 179 S.W.2d 946 (1944), will have no application. In each of those cases, the title companies were corporations for profit. Charges were made and fees were received for legal services rendered to clients of the companies by employee attorneys of the companies. In *Hexter*, this Court pointed out that the facts showed that the employee attorney's first loyalty was to the corporation for which he worked rather than to his client; on occasions, superior officials in the corporation, some being lay officials, instructed the employee attorney as to what kind of instrument to prepare and as to the phrasing of the instrument.

If, on the trial of the case, it is established by competent evidence that the Foundation is truly a legal aid society which acts merely as a conduit or intermediary to bring the attorney and client together and does not purport to control or exploit the manner in which the attorney represents his indigent client, the operations and activities of the Founda-

---

5. *Touchy* is not completely clear that attorneys employed by the Foundation were the persons signing pleadings, motions, and documents filed in court. But no individual employees of the Foundation were parties to the appeal and allegedly engaging in the unauthorized practice of law, thus the employees sign-

ing pleadings and documents on behalf of the Foundation apparently were employee attorneys of the Foundation. The court of appeals' opinion indicates that attorneys employed by the Foundation were the persons signing and filing pleadings, etc. on behalf of the Foundation. *Touchy*, 417 S.W.2d at 628–29.

tion should not be held to be in violation of Article 320a–1, Vernon's Annotated Civil Statutes, which provides that 'all persons not members of the State Bar are hereby prohibited from practicing law in this State.'

*Id.* at 694–95 (emphasis added). Two points made by the Court are notable in regard to the pending matter. First, the Court recognized that actions of the attorneys employed by the Foundation were those of the corporation and that Touchy had the burden to prove "the Foundation is engaged in the unlawful practice of law by directly representing clients as an attorney, by signing pleadings in its name, *or by appearing for such clients through its employees, in presenting pleadings, motions, orders and other documents filed in the several courts of this State.*" *Id.* at 694 (emphasis added). Second, the Court distinguished for-profit corporations where employees provided legal services that resulted in economic benefit to the corporation from nonprofit corporations where neither the attorney nor the corporation benefitted. Even as to the nonprofit Foundation, the Court did not indicate that if the attorneys employed by the corporation filed pleadings and documents in court that the corporation was not practicing law. The Court simply stated that if the Foundation truly functioned as a legal aid society which acted only as a conduit or intermediary (1) to bring the attorney and client together and (2) which did not purport to control or "exploit" the manner in which the attorney represented the indigent client, the Foundation "should not be

held to be in violation of Article 320a–1, Vernon's Annotated Civil Statutes, which provides that 'all persons not members of the State Bar are hereby prohibited from practicing law in this State.'" *Id.*[6]

The State Bar Act (the Act) presently addresses the question of when a person is practicing law. *See* TEX. GOV'T CODE ch. 81. In *Hexter,* we placed our decision "largely upon the statutes" then in place, and did not rely on our inherent or implied powers. *Hexter,* 179 S.W.2d at 954. The Court need take no different approach in this case because the Act directly addresses the issue.[7] The relevant provisions of the Act are not substantively different from provisions of former Penal Code article 430a which this Court addressed in *Hexter,* or the instructions as to how to try the unauthorized practice of law claim in *Touchy.* The Act now provides that for purposes of its provisions,

> the "practice of law" means the preparation of a pleading or other document incident to an action or special proceeding or the management of the action or proceeding *on behalf of a client* before a judge in court as well as a service rendered out of court, including the giving of advice or the rendering of any service requiring the use of legal skill or knowledge, such as preparing a will, contract, or other instrument, the legal effect of which under the facts and conclusions involved must be carefully determined.

TEX. GOV'T CODE § 81.101 (emphasis added). In construing the Act, we ascertain and give effect to the Legislature's intent

---

6. Nonprofit legal services corporations may now contract to pay for services rendered by an attorney to participants in the corporation's plan. TEX. INS.CODE § 961.001(4). The corporation may not, however, contract to practice law, control or attempt to control the relationship between a participant and the participant's attorney, or allow a "contracting

attorney" to be an employee of the corporation. *Id.* § 961.303.

7. For discussions of the Court's inherent and implied powers, *see State Bar v. Gomez,* 891 S.W.2d 243, 245 (Tex.1994), and *Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398–99 (Tex. 1979).

as expressed by the plain and common meaning of the statute's words, *State v. Shumake,* 199 S.W.3d 279, 284 (Tex.2006), unless a contrary intention is apparent from the context, *Taylor v. Firemen's and Policemen's Civil Service Commission of the City of Lubbock,* 616 S.W.2d 187, 189 (Tex.1981), or unless such a construction leads to absurd results. *Univ. of Tex. S.W. Med. Ctr. v. Loutzenhiser,* 140 S.W.3d 351, 356 (Tex.2004).

Former article 430a section 3 precluded a corporation from practicing law or appearing in court "as an attorney for any person other than itself" whereas the current Act effectively incorporates the prohibition on appearing in court for another by including the phrase "on behalf of a client" in the definition of "practice of law." TEX. GOV'T CODE § 81.101(a). The Act also provides that a person may not practice law in Texas unless the person is a member of the state bar and that the state bar is composed of those persons licensed to practice law in Texas. *Id.* § § 81.051, .102(a). The restrictions are essentially the same as those in former Penal Code article 430a, section 1, which formed the basis for *Hexter,* and in the State Bar Act, which formed the basis for *Touchy.* The current Act does not make special reference to insurers and the practice of law as did former article 430a. The context of the definition's statement that the practice of law includes "the management of the action or proceeding on behalf of a client before a judge in court" does not indicate that the words do not mean what they clearly say: management of a court proceeding on behalf of another person is the practice of law. *See Shumake,* 199 S.W.3d at 284; *Taylor,* 616 S.W.2d at 189.

In determining whether an insurer practices law by having its staff attorney represent an insured in a lawsuit, the logical place to begin is with the premise that a corporation cannot act by itself. *See Touchy,* 432 S.W.2d at 694; *Hexter,* 179 S.W.2d at 954. Corporations are legal entities that function through actions of people. *See In re Vesta Ins. Group, Inc.,* 192 S.W.3d 759, 762 (Tex.2006) (noting that corporations must act through human agents); *Holloway v. Skinner,* 898 S.W.2d 793, 795 (Tex.1995) ("Corporations, by their very nature, cannot function without human agents.").

The parties agree that staff attorneys are employed for the purpose of defending insureds at a lower cost than could be achieved if the insurer hired independent counsel. The attorney-client relationship between a staff attorney and an insured comes into being and continues only because of the staff attorney's employment by the insurer. Staff attorneys defending insureds thus are employees performing tasks they were employed to perform and defending persons they are assigned to defend by their employer who benefits financially by the staff attorneys' practice of law. The actions of staff attorneys in so defending insureds undeniably are actions of the corporation. *See In re Vesta,* 192 S.W.3d at 762; *Holloway,* 898 S.W.2d at 796; *Touchy,* 432 S.W.2d at 694; *Hexter,* 179 S.W.2d at 954.

When a corporation's employee attorneys prepare documents for and otherwise represent the corporation itself, the corporation is not practicing law as defined by the plain language of section 81.101(a) of the Act. The attorney employees' actions in such instances are actions of the corporation—it is representing itself. *See In re Vesta,* 192 S.W.3d at 762 (" 'As a general rule, the actions of a corporate agent on behalf of the corporation are deemed the corporation's acts.' " (*quoting Holloway,* 898 S.W.2d at 795)). There is no "client" involved as to such corporate actions other than the attorney-client relationship be-

tween the corporation's employee attorneys and their corporate employer. This means that an insurer representing itself through actions of a staff attorney is not practicing law because the insurer is not preparing pleadings or documents or managing a lawsuit on behalf of a client. But it is different when the insurer's staff attorneys represent insureds in lawsuits. *Hexter*, 179 S.W.2d at 953–54 ("The attorney in preparing such papers does so as the agent of the corporation by whom he is employed.... His acts are the acts of the corporation, and even though the corporation acts through an attorney, it is nevertheless practicing law."). Insureds are not corporate employees or officers who are being defended for actions they took on behalf of the corporation so that their defense is in actuality a defense of the corporation. Insureds are, quite simply, legal entities completely separate from the insurance corporation who must be defended because of acts or omissions not considered to be those of the insurer. So the insurance corporation is not representing itself when it represents its insureds.

There is no contention that insurers are precluded from having staff counsel represent the insurers' own interests in court. It is not unusual for multiple attorneys, each representing different interests, to be present at a proceeding involving an insured. For example, an insured driver involved in an automobile accident might hire a lawyer who then files suit against the driver of the other vehicle. The other driver might assert a counterclaim, or a passenger might join in the same suit and sue the insured. The liability insurer of the original plaintiff will usually hire a separate attorney to defend the claims against the insured and to possibly represent the insurer's subrogation interest, if any. Or if a claim against the insured

involves exposure in excess of primary policy limits and an excess policy is in place, an attorney for the excess carrier may become involved. Or an insurer might have an attorney actually file suit on a subrogation claim. If an insurer wants to have staff counsel represent its own interests, it may do so, but if staff counsel represents the insured then the insurer is also representing a client in court proceedings and is practicing law. *See Touchy*, 432 S.W.2d at 694–95; *Hexter*, 179 S.W.2d at 953–54.

Interpreting the State Bar Act to preclude staff attorneys from defending insureds does not yield an absurd result. *See Loutzenhiser*, 140 S.W.3d at 356. Both authority to control as well as responsibility for controlling corporate actions ultimately lie with the corporation's board of directors, and no claim is made by American Home that its board membership is limited to licensed attorneys. A corporate board's first duties are to the corporation, not customers of the corporation. *See Holloway*, 898 S.W.2d at 795 (noting that it is the duty of corporate officers to protect the interests of the corporation). As part of its duties a board establishes policies, gives overall guidance to the corporation, and hires corporate managers to see that corporate policies and guidance are followed in fulfilling corporate purposes. The board may delegate its authority or right to control the corporation's actions by control of its employees, but the board ultimately remains responsible for corporate actions.

Corporate purposes can be varied, but it cannot seriously be contended that a for-profit corporation does not have making profits and enhancing shareholder value as its primary goals.[8] Good management practices dictate that corporate managers

---

8. Such goals are not criticized; they drive free market economies.

and employees who perform well and increase profits will be rewarded while managers and employees who do not perform well or meet performance goals will usually experience negative employment actions. American Home and amici urge that staff attorneys' decisions and conduct in representing insureds have not induced and will not induce negative corporate personnel actions, and there is no reason to doubt the sincerity of their position. But human experience teaches that in the corporate business community, which is the community inhabited by insurance companies, when profit margins are the focus of the entity and are challenged by factors such as adverse loss ratios, downturns in general economic conditions, or premium price wars, then cost-cutting measures must be, and are, instituted. If such measures are not instituted, every person associated with the corporation feels repercussions, including shareholders whose stock price begins to fall, the board of directors that is responsible to the shareholders, management, and each employee of the corporation whose employment depends on the financial success of the business and their individual contribution to that success. In such circumstances, it defies reason to believe that staff attorneys will be immune from cost-cutting of some nature, even if they are immune at all other times. Cost cutting as to staff attorneys, whenever it occurs, may be in the form of being pressured to handle more lawsuits per lawyer, postponing or refraining from engaging experts, limiting referrals of suits to outside counsel even if retaining the suit is ethically questionable, etc.[9] But corporate cost cutting will come sometime, whether by one of the named insurers in this case, by one or some of amici, or by other corporate insurers. And cost cutting may occur because of financial pressures on the corporation or simply because it is part of the nature of business managers and insurance claims departments to strive for better performance by reducing claims payments and expenses. Most likely the cost-cutting pressures will come from management who are not all attorneys with an understanding of and commitment to the same ethical duties to clients that staff attorneys have, who are not required to make decisions within the context of professional ethics rules, but who nevertheless are in the corporate chain of authority above the staff attorneys. Therein lies the main difference between an insurance corporation and a professional legal corporation. Ultimate control of a professional legal corporation is with attorneys subject to the professional, ethical, and disciplinary rules of conduct. A professional legal corporation also has profit as a goal and seeks to maximize the difference between fee income and ex-

---

**9.** The difficulty with such decisions is demonstrated by one amicus's assertion that staff counsel do not represent insureds when there is a material conflict of interest on a matter that is likely to be litigated in the underlying claim. As an example, the amicus claims that a late notice defense would not be an issue in an underlying tort case. On its face that assertion may not seem problematical. But even if the late notice question is not an issue in the tort case, it might be hard for defense attorneys to avoid dealing with late notice facts and questions in defending the tort case. For example, in preparing for and defending depositions of the insured, a defense attorney almost assuredly will review all the facts surrounding the occurrence with the insured, including when the insured found out about the incident (if the insured was not personally involved), and what actions the insured took after the incident. In pre-suit depositions, many plaintiff's attorneys are curious about what the defendants did after the occurrence, such as reporting the incident to the insurer. For an example of a late notice defense case where the late-notice facts may not have mattered in defense of the tort case, but ended up mattering a great deal to the defense attorney and the insurer, see *Employers Casualty Co. v. Tilley*, 496 S.W.2d 552 (Tex.1973).

penses. But the professional legal corporation has shareholders who are licensed attorneys subject to and limited by professional, ethical, and disciplinary rules. *See* 261 S.W.3d at 29 ("To ensure the quality and integrity of the bar, the Court requires continuing education and imposes strict disciplinary rules, enforced through the grievance process."). When insurance company policies and procedures are formulated and enforced, non-attorney board members, managers, and shareholders are not ethically constrained as are lawyers who are subject to professional discipline. *See Touchy*, 432 S.W.2d at 694.

This record does not evidence directors and managers of the insurers having made anything but ethical business decisions in fulfilling their duties to the corporation. But ethical duties imposed on licensed attorneys as to their clients are different than business ethics of the commercial marketplace. The "practice of law" definition in the State Bar Act does not contain profit or loss considerations. TEX. GOV'T CODE § 81.101. The definition, as relevant here, references only actions taken on behalf of a client, not economic factors. It does not contain an exception allowing corporate insurers to defend insureds whose interests are "congruent" to those of the insurer so the insurer can minimize defense costs and economically benefit its non-attorney management and shareholders. *Id.*

In sum, the Act does not preclude insurers from representing their own interests in lawsuits if they choose to do so. But under the State Bar Act, a corporate insurer cannot represent a client in a lawsuit. Because acts of staff attorneys are acts of the insurer, when staff attorneys defend insureds in lawsuits the insurer violates the Act, is practicing law without a license, and is engaging in the unauthorized practice of law. I would reverse the judgment of the court of appeals and affirm the judgment of the trial court.